710 So.2d 618 (1998)
George W. SCHOLZ, Appellant/Cross-Appellee,
v.
RDV SPORTS, INC., etc., et al., Appellees/Cross-Appellants.
No. 96-0496.
District Court of Appeal of Florida, Fifth District.
March 27, 1998.
Rehearing Denied April 30, 1998.
*620 Bernard H. Dempsey, Jr. and Daniel N. Brodersen of Dempsey & Associates, P.A., Winter Park, for Appellant/Cross-Appellee.
John A. Reed, Morey Raiskin and Janet M. Courtney of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, for Appellees/Cross-Appellants.

ON MOTION FOR REHEARING
ANTOON, Judge.
After reviewing the parties' motions for rehearing, we withdraw our opinion dated September 5, 1997, and substitute the following opinion in its stead.
George Scholz appeals the trial court's final judgment entered in favor of RDV Sports, Inc., the general partner of the Orlando Magic, Ltd. (the Magic). Scholz contends *621 that the trial court erred in granting the Magic's motion for summary judgment on his claim of retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. section 2000e, et seq. He also contends that the trial court erred in directing verdicts in favor of the Magic on his Title VII claims of wrongful discharge and improper refusal to contract in violation of 42 U.S.C. sections 2000e, et seq. and 1981, and 28 U.S.C. section 1331, and on his claim of defamation. We affirm the trial court's ruling entering summary judgment in favor of the Magic on Scholz' retaliation claim but reverse the court's ruling directing a verdict in favor of the Magic on his wrongful discharge, failure to contract, and defamation claims.

FACTS
In 1988, John Gabriel, the Magic's Director of Scouting, spoke with Scholz about possible employment with the Magic. Gabriel told Scholz that his name had originally been suggested for the Magic's head coach position but that Matt had been hired instead. Gabriel allegedly told Scholz that he was "going to get [him] ... as an assistant coach."
In the summer of 1990, Gabriel invited Scholz to speak at the "Matt Goukas Basketball Camp." During the camp, Gabriel advised Scholz that an assistant coaching position might open up, and the two men discussed the responsibilities of the position. Scholz was later invited to attend the NBA Southern Rookie Review in Charlotte, North Carolina to discuss the job further and to become acquainted with the Magic coaching staff. In August of 1990, Scholz accepted the Magic's offer of employment and a press release was issued by the Magic which stated in pertinent part:

SCHOLZ NAMED AS MAGIC ASSISTANT COACH:

* * * * * *
Orlando, FloridaThe Orlando Magic announced today that George Scholz will join the club in a full-time assistant coaching capacity....
Scholz joins the Magic coaching staff after enjoying an impressive eight-year career as head coach at Florida Southern College, an NCAA Division II basketball program located in Lakeland, Florida....
Scholz' written job responsibilities with the Magic included scouting, player development, and team representation. Team media guides and organizational charts described him as a second assistant coach.
In carrying out his job responsibilities, Scholz worked with players individually during the preseason. He also prepared and distributed motivational materials for them. During the first part of the season, Scholz scouted by observing the NBA teams the Magic would play in the near future. He spent the remainder of the season coaching both during practice and from the bench during games. Goukas allegedly told Pat Williams, the Magic's general manager, that he was satisfied with Scholz' performance. Brian Hill, the first assistant coach at the time, also allegedly expressed satisfaction with Scholz. All of Scholz' performance evaluations were positive.
About six months later, in September of 1991, Rich DeVos bought RDV Sports, Inc., which is now the general partner of the Orlando Magic, Ltd., a limited partnership, consisting solely of DeVos family members. DeVos' son-in-law Robert Vander Weide was placed in charge of overseeing the Magic's operations on a day-to-day basis.
In March of 1992, Goukas was allegedly told to keep his eyes and ears open for prospective "black assistant coaches."[1] On March 27, Vander Weide prepared a memo which included a list of NBA teams employing blacks in scouting and coaching positions which revealed that the Magic was one of only five NBA teams not doing so. According to Scholz, Goukas said, "[t]hey want [a black assistant] on the bench out in front of the TV cameras. They want him where he can be seen."
On April 9, Vander Weide authored a memo recommending termination of Scholz' employment. On April 20, Goukas told Scholz that he was not going to be invited *622 back, and on June 11, Vander Weide, Goukas, and Gabriel sent Scholz a letter terminating his employment citing job dissatisfaction. In response, Scholz met with Goukas to express his disagreement with the contents of the termination letter. According to Scholz, he asked Goukas whether he had been fired because the Magic wanted to hire a black assistant, and Goukas answered affirmatively, saving that he had been pressured to hire a black assistant "since day one." On September 24, 1992, Scholz filed this lawsuit against the Magic.

RETALIATION
Scholz alleged in his complaint that the Magic retaliated against him by making defamatory statements after he asserted that he had been discriminated against because of his race. The trial court granted the Magic's motion for summary judgment on Scholz' retaliation claim, concluding that, although Scholz had filed a timely charge with the Equal Employment Opportunity Commission (EEOC), he had failed to satisfy the substantive and procedural presuit requirements of 42 U.S.C. § 2000e. We affirm this ruling. The trial court correctly determined that since Scholtz failed to include the defamatory statements described in his complaint in his EEOC charge, he essentially waived his right to sue for retaliation based on those statements.
In Cheek v. Western & Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir.1994), the Seventh Circuit explained the significance of the EEOC presuit procedure:
As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge. Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). This rule serves the dual purpose of affording the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion, Id. at 44, 94 S.Ct. at 1017, and of giving the employe[r] some warning of the conduct about which the employee is aggrieved. Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir.1992); Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir.1989). Although the rule is not jurisdictional, Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392, 102 S.Ct. 1127, 1131, 71 L.Ed.2d 234 (1982), it is a condition precedent with which Title VII plaintiffs must comply. Babrocky v. Jewel Food Co., 773 F.2d 857, 864 (7th Cir.1985). For allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge.
Cheek, 31 F.3d at 500.
Notwithstanding the liberal construction afforded the Title VII presuit procedure,[2] its requirements cannot be overlooked. In this regard, Title VII claims set forth in a complaint are cognizable only if they encompass allegations which are like or reasonably related to the allegations contained in an EEOC charge. Jenkins v. Blue Cross Mut. Hosp. Ins., Inc., 538 F.2d 164, 167 (7th Cir. 1976) (en banc) (quoting Danner v. Phillips Petroleum Co., 447 F.2d 159, 162 (5th Cir. 1971)), cert. denied, 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). See also Sanchez, 431 F.2d at 466. The Jenkins test is satisfied if: (a) there is a reasonable relationship between the allegations in the EEOC charge and the claims in the complaint, and (b) the claims in the complaint can reasonably be expected to grow out of an investigation into the allegations in the EEOC charge. Cheek, 31 F.3d at 500. "This means that the EEOC charge and the complaint must, at minimum, describe the same conduct and implicate the same individuals." Id. (emphasis in original).
There are many ways in which an employer may retaliate against an employee, and thus, a claim of retaliation in an EEOC charge and a claim of retaliation in a complaint are not necessarily "reasonably related" merely because they both assert forms of *623 retaliation. See Cheek, 31 F.3d at 501. Here, although both Scholz' EEOC charge form and his complaint alleged retaliation, the similarity ended there. In his EEOC charge form, Scholz stated in relevant part:
I believe that I have been discriminated against in violation of Title VII because of my Race/White and Retaliation 704(a) by discharge for the following reasons:
1. On or about March 16, 1992, I expressed my concerns about being discriminated against because of my Race.
2. After voicing my concerns about being discriminated against, management stated I was not performing my duties and subsequently fired me.
3. In June 1992, a non-White candidate was offered the job of second assistant coach.
Under the "cause of discrimination" category, the investigator checked the "race" and "retaliation" boxes on the charge form. Thus, Scholz' EEOC charge form asserted a claim of retaliation based upon his termination from employment.
In contrast, the retaliation claim set forth in this lawsuit was based on statements about Scholz published by the Magic. Specifically, in his complaint Scholz alleged that the Magic had published defamatory statements about him in retaliation for his racial discrimination charge. The statements cited were essentially statements that Scholz had been an advance scout for the team rather than an assistant coach, that the Magic could not comment upon his employment and that he had a history of employment problems. Importantly, there was no mention of the allegedly defamatory statements made by Magic personnel in Scholz' EEOC charge. Thus, there was no reasonable nexus between the retaliation claim alleged in Scholz' EEOC charge form and the retaliation claim set forth in his complaint. See Rush v. McDonald's Corp., 966 F.2d 1104, 1110 (7th Cir.1992).[3] Accordingly, we affirm the trial court's entry of summary judgment as to this claim.

WRONGFUL TERMINATION AND REFUSAL TO CONTRACT
Scholz also alleged in his complaint that the Magic engaged in unlawful employment practices in violation of 42 U.S.C. §§ 2000e, et seq. and 1981 and 28 U.S.C. § 1331. Specifically, he alleged that his employment was terminated and that he was prohibited from contracting because of his race. The Magic alleged in response that its decision to terminate Scholz' employment and its refusal to contract with him for the 1992-1993 season were based on bona fide business considerations. The Magic specifically denied that race was a factor in its decision to terminate Scholz' employment.
Title VII provides that "[i]t shall be an unlawful employment practice for an employer... to discharge any individual ... because of such individual's race ..." and that "an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e(a)(1), (m). Title VII extends protection against intentional racial discrimination to both minority and nonminority employees. McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 278, 96 S.Ct. 2574, 2577-78, 49 L.Ed.2d 493 (1976). In that regard, where a plaintiff alleges a claim of reverse discrimination, the plaintiff must prove that he or she (1) belongs to a class; (2) was qualified for the job; (3) was terminated from the job; and (4) was replaced by a minority group member. See Wilson v. Bailey, 934 F.2d 301, 304 (11th Cir.1991). Other circuits require the plaintiff to show the existence "`of background circumstances [which] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" Bush v. Barnett Bank of Pinellas County, 916 F.Supp. 1244, 1253 (M.D.Fla.1996) (quoting Notari v. Denver Water Dep't, 971 F.2d 585, 588 (10th Cir.1992)).
*624 A prima facie case of unlawful racial discrimination can be established by direct or circumstantial evidence. Direct evidence is "`[e]vidence, which if believed, proves existence of a fact in issue without inference or presumption.'" Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528, n. 6 (11th Cir.1987) (quoting Black's Law Dictionary 413 (5th ed.1979)). For example, statements or admissions of an employer or its agent can be direct evidence. Miles v. M.N.C. Corp., 750 F.2d 867, 870 (11th Cir.1985) (relying on B. Schlei & P. Grossman, Employment Discrimination Law 1316-1317 (1983)). In contrast, circumstantial evidence is evidence giving rise to an inference of discriminatory intent. See Moulds v. Wal-Mart Stores, Inc., 935 F.2d 252,254 (11th Cir.1991).
The determination of whether an employee has established a prima facie case of racial discrimination, requiring the trial court to allow the case to proceed to jury resolution, differs depending upon whether the employee has presented direct or circumstantial evidence. In order to establish a prima facie case for wrongful discrimination by direct evidence, a plaintiff must present evidence that the employer acted with a discriminatory motive. Id. This evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." Bush, 916 F.Supp. at 1252 (citing Randle v. LaSalle Telecommunications, Inc., 876 F.2d 563, 569 (7th Cir.1989)). If there is direct evidence of discrimination, the burden shifts to the defendant to show by a preponderance of the evidence that the plaintiff would have been discharged even absent the discriminatory motive. See E.E.O.C. v. Alton Packaging Corp., 901 F.2d 920, 923 (11th Cir.1990).
However, direct evidence of a discriminatory employment practice is rarely available. Recognizing this fact, the Supreme Court developed a procedure for analyzing circumstantial evidence in employment discrimination cases. In Hawkins v. Ceco Corp., 883 F.2d 977, 980-81 (11th Cir.1989), cert. denied, 495 U.S. 935,110 S.Ct. 2180,109 L.Ed.2d 508 (1990), the Eleventh Circuit Court of Appeals, relying on the landmark case of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), explained the procedures and the plaintiff's burden in Title VII claims for wrongful discharge based on circumstantial evidence as follows:
The McDonnell-Douglas procedure allows a court to analyze circumstantial evidence by creating inferences of discriminatory intent. A court accords proper weight to the evidence by shifting burdens of proof. The plaintiff retains the ultimate burden of persuading the trier of fact that the defendant is guilty of intentional discrimination. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).
Under McDonnell-Douglas, a plaintiff is first required to create an inference of discriminatory intent by establishing a prima facie case of racial discrimination. If he cannot do so, then the defendant need not present any reason for its action and the court must determine if the plaintiff has met his ultimate burden. But if the plaintiff does present a prima facie case, the defendant may counter the inference of discrimination by articulating some legitimate, nondiscriminatory reason for rejecting the employee. McDonnell-Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant responds by adequately explaining its rationale, the plaintiff, in order to prevail, must present evidence that defendant's proffered reasons are merely pretexts for discrimination. The burden to establish pretext merges with plaintiff's ultimate burden of proof of intentional discrimination. Burdine, 450 U.S. at 256, 101 S.Ct. at 1095.
By shifting inferences, the court can assess the validity of the articulated rationale for an employee's dismissal, eliminating the most common, nondiscriminatory reasons. Burdine, 450 U.S. at 253-54, 101 S.Ct. at 1094. The court assumes that employers act with some reason. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If all valid reasons are rejected as pretextual, then it is likely that discrimination was the true reason. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, *625 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). This analysis pares down the conflicting claims, allowing the court to focus on the ultimate question of whether the defendant intentionally discriminated against the plaintiff. Aikens, 460 U.S. at 714-15,103 S.Ct. at 1481.
Scholz maintains that he met his burden of proof under both the direct and circumstantial evidence standards, and that consequently, the trial court erred in directing a verdict in favor of the Magic. We agree.
In support of his wrongful termination claim, Scholz submitted testimony regarding statements allegedly made by Goukas. Those statements included admissions allegedly made by Goukas that Scholz' termination was motivated by the Magic's desire to hire a black assistant coach and that, but for this desire, Scholz' employment would not have been terminated. Additionally, Scholz submitted evidence that Goukas had stated that the Magic had been interested in hiring a black second assistant and that Otis Smith, a former Magic player, had been mentioned for the job. Also, evidence was submitted indicating that Goukas had also stated that the Magic had been pressured to hire a black assistant "since day one."
In addition to this direct evidence of racial discrimination, Scholz also submitted circumstantial evidence of discrimination. For example, he submitted evidence which indicated that the Magic was pressured by management to hire a black assistant coach, as reflected in internal memoranda as well as the minutes of the Orlando Magic Community Advisory Board. Scholz also testified that prior to his termination he was never placed on notice that his work was deficient in any respect. He submitted evidence of his positive employment evaluations, including an evaluation received just weeks before the decision to terminate him. Also, he established that both Matt Goukas and Brian Hill indicated that they were satisfied with his performance, and that following the 1992-1993 season, the Magic hired an assistant coach who was black.
Importantly, as noted above, it was not necessary for Scholz to prove that race was the sole reason for his termination. See 42 U.S.C. § 2000e-2(m); Harris v. Shelby County Bd. of Educ., 99 F.3d 1078, 1084 (11th Cir.1996). Rather, he was only required to submit evidence indicating that race was a motivating factor in making the decision. The trial court, after having specifically found that "race may have been one of the many factors in Mr. Scholz' discharge,...," erred in granting the Magic's motion for a directed verdict on this claim.

DEFAMATION
Scholz sued the Magic for defamation citing certain statements made by the team's personnel. The statements forming the basis of this claim included statements that:
(1) Scholz was "never a coach;"
(2) "[Scholz] followed [his] own agenda;"
(3) "[Scholz'] actions and comments showed that [his] professional and personal styles were different" from other staff members; and
(4) "[Scholz'] goals and visions differed" from the staff and team.
The trial court directed a verdict in favor of the Magic on Scholz' defamation claim, reasoning that (1) Scholz had failed to present a prima facie case of defamation, and (2) the Magic's statements to the media were qualifiedly privileged as a matter of law. The court erred in so ruling.
Generally, a statement is defamatory when it injures a person in his trade or profession. See Adams v. News-Journal Corp., 84 So.2d 549, 551 (Fla.1955); Seropian v. Forman, 652 So.2d 490, 495 (Fla. 4th DCA 1995). In determining whether statements are defamatory, the finder of fact must first decide whether "from the language of the comment, it does not seem unreasonable to infer that persons hearing the same and possessed of a common mind might have taken it to mean that the plaintiff was a person with whom commercial relations were undesirable." Wolfson v. Kirk, 273 So.2d 774, 778 (Fla. 4th DCA), cert. denied, 279 So.2d 32 (Fla.1973). The instant record reveals that, contrary to the trial court's ruling, Scholz had presented a prima facia case of defamation by presenting evidence that the Magic's statements were untrue, and by establishing *626 the context in which the statements were made and the impact they were likely to have on his profession.
As for the trial court's ruling that the Magic's statements were qualifiedly privileged, Scholz contends that the trial court misapplied the law. We agree.
Generally, one who publishes a defamatory statement is not liable for the publication of that statement if it is published upon an occasion that makes it qualifiedly privileged and the privilege is not abused. RESTATEMENT (SECOND) OF TORTSS § 593 (1977). The case of Nodar v. Galbreath, 462 So.2d 803 (Fla.1984), involved such a privilege. As the Nodar court observed, there is a broad range of occasions upon which a defamatory communication is privileged. The court defined one type of privileged communication as follows:
[A] communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.
Id. at 809 (citations omitted). Applying the foregoing principle, the Nodar court held that the privilege applied to a father's defamatory statement about his son's tenth-grade English teacher made at a county school district governing board meeting attended by the public. Specifically, the father had expressed concern regarding the course curriculum, the teacher's victimization, harassment, and verbal abuse of his son following an inquiry about his grades and the teacher's qualifications.
We agree that the trial court erred in concluding that the privilege articulated in Nodar applied to the Magic's allegedly defamatory communications. The instant record demonstrates that in September and October of 1992, the Magic, through its Executive Vice President Jack Swope, made several statements to the press including the following:
(1) That Scholz had been hired as an advance scout and that any reference to him as an assistant coach "was just a label;'
(2) That Scholz was considered an advance scout, not an assistant coach, ... `That was just a label so he could qualify for the coaches' pension plan;' and
(3) `George was an advance scout,' ... `He was never a coach for us.'
Swope also provided the press with a copy of Scholz' termination letter, the following portion of which was published:
`[Y]ou followed your own agenda much of the time' and `[y]our goals and visions for the Magic differed from those of other staff and coaching team members.'
These statements were not privileged under Nodar because they were not made by the Magic to a party who possessed a corresponding interest; the Magic had no common interest with those members of the media to whom the allegedly defamatory statements were made.[4]
Next, we consider the fact that, in entering a directed verdict in favor of the Magic, the trial court determined that Scholz was a public figure. The parties have not challenged this determination and there is ample record support for the court's conclusion. In this regard, the record demonstrates that Scholz was a highly successful college basketball coach and was employed by the Orlando Magic, a popular and successful professional team. Scholz also drew public attention to himself and his employment status with the Magic when he met with newspaper reporters at his lawyer's office immediately after he filed his lawsuit against the Magic. See Rosenblatt v. Boer, 383 U.S. 75, 76, 86 S.Ct. 669, 671,15 L.Ed.2d 597 (1966).
In order for a public figure to succeed on a defamation claim, he must prove that the publisher of the defamatory statement acted with actual malice. Nodar, 462 So.2d at 806. Actual malice is established by showing that the publication was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *627 New York Times Co. v. Sullivan, 376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964).
In the instant case, the question was whether the Magic's statement to the media that Scholz was never a coach was made with knowledge of its falsity or with reckless disregard of the truth. This question was one of fact for the jury to decide because the record contains considerable dispute with regard to Scholz' role with the Magic. Scholz presented testimony and documentary evidence indicating that he was an assistant coach for the Magic. However, the Magic maintained that he was a scout rather than a coach and that he was given the label "coach" for the sole purpose of qualifying him for the organization's pension plan. When the surrounding circumstances and content of an alleged defamatory statement are disputed, the question of whether the publication of the statement is privileged is a question of fact to be determined by the jury. Nodar, 462 So.2d at 810; Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam County, 616 So.2d 562, 570 (Fla. 5th DCA 1993).
Finally, we note that the Magic contends that even if this court concludes that the trial court's reasons for granting the directed verdict in favor of the Magic on Scholz' defamation claim were incorrect, the ruling must be affirmed because the allegedly defamatory statements were privileged since (1) they were made in the course of litigation and (2) they were merely statements of opinion made by its management personnel. These arguments are without merit.
Generally, statements made during the course of litigation are privileged and will not constitute the basis of an action for defamation. See Levin, Middlebrooks, Mabie, Thomas, Mayes and Mitchell, P.A. v. U.S. Fire Ins. Co., 639 So.2d 606, 607 (Fla.1994). The purpose of this privilege is to prevent "the chilling effect on free testimony and access to the courts...." Wright v. Yurko, 446 So.2d 1162, 1164 (Fla. 5th DCA 1984). However, the Magic's statements were not made during the course of litigation, were not statements made to the court or opposing counsel, and were not included as testimony. Instead, the statements were made to the media in response to Scholz' allegations that he had been fired because of racial discrimination.
As for the Magic's argument that its statements were expressions of opinion protected by the First Amendment, this privilege does not extend to defamatory statements asserting a factual charge. Ford v. Rowland, 562 So.2d 731, 735 (Fla. 5th DCA), rev. denied, 574 So.2d 143 (Fla.1990). Also, a statement is not protected as opinion if it implies the existence of undisclosed defamatory facts as its basis. Stembridge v. Mintz, 652 So.2d 444, 446 (Fla. 3d DCA 1995) (quoting RESTATEMENT (SECOND) OF TORTS § 566 (1977)). Instead, a jury issue is presented if a statement is reasonably interpreted as a statement of undisclosed existing defamatory fact. Id. at 446 (relying on Eastern Air Lines, Inc. v. Gellert, 438 So.2d 923, 927 (Fla. 3d DCA 1983), overruled on other grounds, sub nom. Ter Keurst v. Miami Elevator Co., 486 So.2d 547 (Fla.1986)). Thus, in the instant case, it was for the jury to decide whether the Magic's statements were defamatory.

CROSS-APPEAL
In its cross-appeal, the Magic raises an evidentiary issue which requires comment. The Magic contends that the trial court erred by allowing Scholz to testify regarding conversations which he allegedly had with Matt Goukas when Goukas was the Magic's head coach. The comments related to the Magic's motives in terminating Scholz' employment, including (1) Goukas' affirmative response to Scholz' question of whether Scholz would have retained his job but for the fact that the Magic had wished to hire a black assistant coach; (2) Scholz' contention that Goukas told him he had been forced "to do it" [presumably to fire Scholz]; and (3) Scholz' contention that Goukas told him that the Magic had been pressured to hire a black coach "since day one." The Magic also contends that the trial court erred in admitting Scholz' testimony regarding an alleged comment made by Otis Smith in March 1992 that he had been offered an assistant coaching position. *628 We affirm the trial court's ruling with regard to the statements attributed to Goukas but rule that the statement attributed to Smith was improperly admitted.
The trial court determined that the objectionable statements fell within the following hearsay exception:
90.803 Hearsay exceptions; availability of declarant immaterial.The provision of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness.
* * * * * *
(18) ADMISSIONS.A statement that is offered against a party and is:
* * * * * *
(d) A statement by his agent or servant concerning a matter within the scope of the agency or employment thereof, made during the existence of the relationship....
§ 90.803(18)(d), Fla. Stat. (1995). Pursuant to this statute, statements made by employees concerning the course and scope of their employment are admissible against the employer. Metropolitan Dade County v. Yearby, 580 So.2d 186, 189 (Fla. 3d DCA), rev. denied, 589 So.2d 291 (Fla.1991). This is true even in those instances where the employee's statement is not based on his personal knowledge. Id., 580 So.2d at 189.
The trial court correctly admitted the statements allegedly made by Goukas because the record demonstrates that Goukas was intimately involved with employment decisions pertaining to the team's assistant coaches, including Scholz. Significantly, he co-authored the termination letter setting forth the reasons for Scholz' discharge. Also, when asked who had made the decision to terminate Scholz' employment, Goukas responded:
Well, with my dealings with [Vander Weide] and [Gabriel], it was primarily their wish. And yet the way we made most of our decisions, we kind of all come together and talk them through, discuss them and I had to eventually agree to it. Goukas testified that he was initially uncomfortable with the decision to fire Scholz and that he had asked for some time to think about it. When Vander Weide told him that Scholz' termination of employment was in the team's best interest, he became "comfortable" with the decision. Vander Weide later said to Goukas, "I think it's time to do it ... If you don't want to be the messenger, I'll do it." Goukas replied, "[n]o, it's my responsibility. I'll do it." This testimony clearly demonstrates that Scholz' termination was within the scope of Goukas' employment.
However, the statement attributed to Otis Smith is a different matter. There is no record evidence demonstrating that Smith's employment responsibilities in any way involved Scholz. Smith was a Magic player at the time the alleged statement was made and personnel issues were outside the scope of his employment. Thus, the trial court erred in admitting testimony concerning comments made by Smith

CONCLUSION
We reverse the trial court's order directing a verdict in favor of the Magic on Scholz' claims for wrongful discharge, refusal to contract, and defamation and remand this matter for further proceedings. In all other respects, we affirm.
AFFIRMED in part; REVERSED in part; REMANDED.
W. SHARP and GOSHORN, JJ., concur.
NOTES
[1] We use the term "black" because that is the term utilized by the parties.
[2] It is well established that the Title VII procedure should be user-friendly and that substance should prevail over form. See Sanchez v. Standard Brands, Inc., 431 F.2d 455, 465 (5th Cir. 1970).
[3] Because Scholz' EEOC charge was not reasonably related to his claim of retaliation in the complaint, we do not need to speculate whether the claim in the complaint could be expected to grow out of an EEOC investigation.
[4] Compare the situations outlined in section 596 of the Restatement of Torts.