729 So.2d 440 (1999)
Joseph MAGRE, M.D., Appellant,
v.
Michael J. CHARLES, M.D., Appellee.
No. 98-2138.
District Court of Appeal of Florida, Fifth District.
March 5, 1999.
Rehearing Denied April 13, 1999.
*441 Richard T. Jones, Gainesville, for Appellant.
Michael J. Charles, St. Augustine, pro se.
*442 W. SHARP, J.
Dr. Joseph Magre appeals from a final summary judgment in favor of Dr. Michael Charles in an action for defamation and intentional interference with a business relationship. We agree with the trial court that Dr. Charles' statements to The Florida Bar were absolutely privileged and thus summary judgment was properly entered in his favor on this count. However, we conclude that Dr. Charles' letter to fellow physicians, which was highly critical of Dr. Magre, creates issues of fact regarding his possible liability for defamation and intentional interference with a business relationship. Therefore, we reverse the summary judgment on these counts and remand for further proceedings.
Dr. Magre and Dr. Charles are surgeons practicing in St. Johns County. Both are on the medical staff of Flagler Hospital. Dr. Magre's staff privileges with the hospital were suspended. On December 23, 1993, the Medical Executive Committee of Flagler Hospital held a meeting to discuss this suspension. Dr. Charles attended a portion of the meeting but left before it was over. Dr. Charles later learned that Dr. Magre had been reinstated. Dr. Charles was upset by this and sent a letter, dated December 27, 1993, to the hospital staff members who were not at the meeting. The letter contains Dr. Charles' recollection of the meeting as well as his criticism of Dr. Magre and the reinstatement. A copy of this letter is attached as appendix A.
In February of 1994, Dr. Magre filed suit against Dr. Charles. The complaint alleged that the December 27th letter had defamed Dr. Magre. A few months later, in April 1994, Dr. Charles sent a letter to The Florida Bar, complaining about the attorney for Dr. Magre. Dr. Charles attached a copy of his December 27th letter to the Bar complaint. The Florida Bar found no violation.
In June 1994, Dr. Magre amended his complaint to include three counts. Count one alleged that the December 27th letter had defamed him. Count two alleged that the April letter to The Florida Bar and its attachment had defamed him. Count three alleged that the December 27th letter was an intentional interference with Dr. Magre's relationship with Flagler Hospital and the members of its medical staff.
The trial court concluded that the statements in the December 27th letter were pure opinion and therefore not actionable. The court also found that the April letter to The Florida Bar was absolutely privileged and that privilege extended to the letter that was attached to the complaint. Finally, the court found that Dr. Charles had not interfered with Dr. Magre's business relationships because Dr. Charles' statements were not defamation but were merely opinion.
On appeal, Dr. Magre contends that the court erred in entering summary judgment in favor of Dr. Charles on the defamation count of the complaint. Dr. Magre argues that Dr. Charles failed to conclusively establish that his December 27th letter was a statement of pure opinion and hence not actionable.
We recognize that expressions of pure opinion are privileged and protected by the Constitution. Nodar v. Galbreath, 462 So.2d 803 (Fla.1984); Beck v. Lipkind, 681 So.2d 794 (Fla. 3d DCA 1996); From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981), rev. denied, 412 So.2d 465 (Fla.1982). Dr. Charles' letter, however, goes beyond pure opinion. Dr. Charles claimed that the meeting had a "total lack of a balanced forum and equal representation." Rather than merely stating his opinion, Dr. Charles stated "the truth is there were and are grave doubts regarding Dr. Magre's ability to insure the safety of the public in these cases ...." (emphasis added) Dr. Charles asserted that the other physicians "are at risk as well" and that they could be held personally responsible for the actions of the committee in reinstating Dr. Magre. Dr. Charles then advised his fellow staff members to contact their own attorneys regarding this matter.
Although these statements are not absolutely privileged, they are protected by a qualified privilege. Our supreme court explained the concept of qualified privilege in Nodar:
`One who publishes defamatory matter concerning another is not liable for the *443 publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused.' Restatement (Second) of Torts § 593 (1976). The law of Florida embraces a broad range of the privileged occasions that have come to be recognized under the common law. See Rahdert & Snyder, Rediscovering Florida's Common Law Defenses to Libel and Slander, 11 Stetson L.Rev. 1 (1981). `A communication made in good faith on any subject matter by one having an interest therein, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation.' 19 Fla.Jur.2d Defamation and Privacy § 58 (1980). See Abraham v. Baldwin, 52 Fla. 151, 42 So. 591 (1906). (footnote omitted)
462 So.2d at 808. See also Scholz v. R.D.V. Sports, 710 So.2d 618 (Fla. 5th DCA), rev. denied, 718 So.2d 170 (Fla.1998); Beck.
Here the letter was distributed to fellow physicians who clearly had an interest in the substance of the communication. Thus the defamatory statements were qualifiedly privileged. See Nodar (qualified privilege attached to remarks made by father of a student complaining of student's teacher at a school board meeting); Randolph v. Beer, 695 So.2d 401 (Fla. 5th DCA 1997) (defamatory statement made by a credit union's chairman to the Board of Directors concerning a rumor that an insurance agent was involved in a kick-back scheme with the credit union's president was subject to a qualified privilege). Since the defamatory statement was protected by a qualified privilege, the burden shifted to Dr. Magre to establish that the privilege was lost through malice or improper purpose. Nodar; Randolph. This is a material issue of fact to be resolved by the fact finder. Further, if there is sufficient evidence to indicate that the privilege was exceeded or abused, then that issue must also be submitted to the fact finder. Nowik v. Mazda Motors of America (East), Inc., 523 So.2d 769 (Fla. 5th DCA 1988).
Next, Dr. Magre argues that the trial court erred in entering summary judgment in favor of Dr. Charles on count two of the complaint, concerning Dr. Charles' letter to The Florida Bar regarding Dr. Magre's attorney. In this letter, Dr. Charles also complained about Dr. Magre's treatment of patients, and attached a copy of his December 27th letter to the Bar complaint.
In Tobkin v. Jarboe, 710 So.2d 975 (Fla. 1998), the Florida Supreme Court held that an individual who files a complaint against an attorney and makes no public announcement of the complaint, thereby allowing the grievance procedure to run its natural course, is afforded absolute immunity from a defamation action by the complained against attorney. The court recognized that complainants must be encouraged to step forward with legitimate complaints and this will further the public policy of disciplining attorney misconduct.
Although Tobkin involved a defamation action by the attorney, we conclude that the bar of absolute privilege must extend to the attorney's client, in this case Dr. Magre, and to all information necessary to investigate the complaint. Otherwise, those with legitimate complaints may hesitate to come forward for fear of lawsuits by third parties. The critical statements concerning Dr. Magre in the letter to The Florida Bar, as well as the December 27th letter attached to the complaint, are simply part of the background of the dispute and litigation between these parties. Thus these statements are protected by an absolute privilege.
Finally, Dr. Magre contends that the trial court erred in entering summary judgment in favor of Dr. Charles on count three of the complaint alleging interference with a business relationship. Dr. Magre alleged that the December 27th letter contained untrue statements concerning his professional skill and reputation and that the letter interfered with his relationship with Flagler Hospital and with other physicians on the staff at the hospital who refer patients to him.
The elements of the tort of intentional interference with an advantageous business relationship are: 1) the existence of a business *444 relationship, not necessarily evidenced by an enforceable contract; 2) knowledge of the relationship on the part of the defendant; 3) an intentional and unjustified interference with that relationship by the defendant; and 4) damage to the plaintiff as a result of the breach of the relationship. Florida Fern Growers Ass'n v. Concerned Citizens of Putnam County, 616 So.2d 562 (Fla. 5th DCA 1993); McCurdy v. Collis, 508 So.2d 380 (Fla. 1st DCA), rev. denied, 518 So.2d 1274 (Fla. 1987); Nowik v. Mazda Motors of America (East), Inc., 523 So.2d 769 (Fla. 1st DCA 1988).
Here, Dr. Charles' letter came after Dr. Magre's reinstatement with full staff privileges. Thus the letter would not constitute intentional and unjustified interference with a business relationship with the hospital. See Miami Child's World, Inc. v. Sunbeam Television Corp., 669 So.2d 336 (Fla. 3d DCA 1996) (allegedly defamatory news broadcast could not have constituted intentional and unjustified interference with a business relationship between the city and the plaintiff where the news broadcast was aired after the relevant meeting of the City Commission). However, the letter may constitute intentional and unjustified interference with Dr. Magre's business relationship with other doctors who refer patients to him. See Nowik (tort extends to interference with efforts to obtain employment); McCurdy (tort covers interference with a contract terminable at will). Thus summary judgment was improvidently entered on this portion of count three.
AFFIRMED in part; REVERSED and REMANDED in part.
GOSHORN, J., and LESTER, K.R., Associate Judge, concur.

APPENDIX A
To: Flagler Staff Members not invited to a special meeting of the Executive Committee on Thursday, December 23, 1993
From: Michael J. Charles MD.
Date: December 27, 1993

Dr. Magre Fully Reinstated After Lopsided Committee Meeting Forum
This meeting was called for by Dr. Magre. Its format, as was explained to me, was that Dr. Magre could invite any physician he wanted toin addition to his lawyer. I was invited as a past Chief of Surgery and not as a member of the present Executive Committee. I am a member of the Surgical Subcommittee QA, of which I've been a member for three years. Dr. Norris is a long standing member of the Surgical QA, however he was not invited.
Prior to the meeting, I was told by Dr. Shale and other members that there would be no discussion of individual cases at this meeting. I was supposed to be there to explain the workings of the QA and how the charts are reviewed. During the course of the meeting, I explained that Dr. Magre was not on 100% review and that these charts were a matter of routing screenings. When they started falling out at a prodigious rate, the members became alarmed and felt that something should be done. As this is the first time that Dr. Magre has been reviewed by this hospital, it was felt that the fairest thing to do was to select a certain amount of charts for outside review. These actions are a standard routine performed in all hospitals with which I've ever been associated.
The reason I feel the need to inform my fellow staff members of what actually took place on Thursday is that I've never felt more ill at ease and disturbed by any other meeting I've ever been to. The reason? The total lack of a balanced forum and equal representation. For example, those members who came in support of Dr. Magre were allowed to speak whenever they wished to. Other non-Executive Committee members (myself included) were not allowed to speak. This was requested by Dr. Mahs and his request was immediately approved vend by the Committeewithout so much as a vote!
Comments made by Dr. Tessler were very uncomplimentary to the Sub Q Committee He referred to the committee as "know nothings" comprised of an orthopod, a plastic surgeon and "whatever the other guy is"a derogatory remark made against Dr. Norris *445 to which everyone immediately reacted. (Editor's Note: I'd like to go one the record as saying that I'd match Dr. Norris' surgical knowledge against any general surgeon. Few know more than he does about die latest surgical advancements and technology.)
Dr. Tessler has gone on record before as decrying the entire QA systembelieving that no doctor has the right to review any other doctor's chart. Dr. Kahlid indicated that he received a letter from the Surgical QA that was so inane that he questioned the medical knowledge of The committee, and whether they were even fit to practice any form of medicine due to their ignorance. Dr. Magre made some opening comments regarding Dr. Fisher's review which apparently was the final straw that compelled Dr. Maguire to summarily suspend Dr. Magre. Dr. Magre went case by case and criticized Dr. Fisher's review, pointing out certain discrepancies in the charts. Dr. Winkler expressed his belief that some intern most did the review because Dr. Fisher, being a member of so many different societies and groups, couldn't possibly have spent the time needed to review these charts properly. Dr. Rosas stood up and attested to Dr. Magre's surgical skill in dealing with his patients and felt that the Surgical Subcommittee owed Dr. Magre's an apology. He then left the meeting.
Dr. Magre continued to go down the list of cases. Dr. Tessler made no comments about the surgical questions, and there were no surgeons other than Dr. Maguire in attendance to ask such questions. Dr. Shiff and Dr. Marathe made comments regarding certain cases that indicated Dr. Fisher scanned these charts. Dr. Maguire came under considerable fire for not going back over all the charts and comparing them against Dr. Fishers notes. (Before this reporter left, Dr. Scarpetti got up and wanted it to be known that Dr. Charles was "doing a lot of smirking" to which Dr. Mussallem immediately responded, "Yeah, I saw that."Indicating that I would not be subject to such ridicule and that I had quite enough of this totally inappropriate format. I excused myself and proceeded to emergency surgery.)
I don't know what occurred afterward, but by afternoon Dr. Magre was fully reinstated with full staff privileges. This format for the exoneration of Dr. Magre was the most unbalanced process I has ever witnessed. Also, the criticism that. Dr. Maguire and the subcommittee were exposed to went well beyond the bounds of fairness. The truth is, ours goes out of its way to be the most lenient committee I've ever seen. We invite all the members of the surgical staff to come to the QA to help us with the charts. Dr. Tessler has been invited many times but he never comes. Dr. Kluger is the only one to have shown up. We accept almost all letters of explanation, and we enjoy being squelched when we are wrongespecially when a doctor cites a recent article to prove his point. This is the way we learn and how the QA becomes a rewarding process for everybody. There are some doctors who take every letter as a personal insult and respond in the most vitriolic manner. But we endure all of this because we are interested in good quality of care, even though Dr. Maguire and my practice have suffered by sending out letters to thin-skinned physicians.
The main reason for outrage over what transpired last Thursday is that Dr. Magre was reinstated without a thorough and fair hearing by his peers. The format style should favor the safety of the public first; everything else should follow this. Instead, Dr. Magre's erroneous concern that be was somehow targeted without any justification was the overwhelming concern.
Page 3
The truth is there were and are grave doubts regarding Dr. Magre's ability to ensure the safety of the public in these casesdoubts which caused the Chief of Surgery to suspend him. This came about after a long, fair process of review. This being the case, neither he nor anyone else in this situation should have been allowed to continue practicing in an unrestricted manner until a proper review forumeven one with an outside agencycould take place.
In addition to the potential risk patients have now been exposed to, you are at risk as well. As a member of the potential staff of Flagler *446 Hospital, you can be held personally responsible for the actions of your Executive Committee. This means you can be liable for the irresponsible,unfair action of the Committee in this matter. For this reason, I would strongly advise all my fellow staffers to contact your attorneys and determine the best course of action to protect yourselves from this real exposure.
In the meantime, contact the Executive Committee and let them know how you feel about the outrageous format that was allowed to undermine the future credibility of the Committee in this matter.