AMENDED OPINION

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2001
THOMAS K. KAHN
CLERK

_____

No. 99-12939

_____

D. C. Docket No. 98-00252-CV-DMM

INTERNATIONAL SALES & SERVICE, INCORPORATED,
a Florida corporation,

Plaintiff-Appellant,

versus

AUSTRAL INSULATED PRODUCTS, INCORPORATED,
a Georgia corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 30, 2001)**

Before EDMONDSON, WILSON and MAGILL*, Circuit Judges.

_____
*Honorable Frank J. Magill, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

MAGILL, Circuit Judge:

International Sales & Service, Inc. ("ISS") sued Austral Insulated Products, Inc. ("Austral") for tortious interference with an advantageous business relationship. After the jury returned a verdict for ISS, the district court entered judgment as a matter of law for Austral. We affirm.

## I.

ISS was a distributor of, and manufacturer's representative for, various products, principally aviation wire. In 1990, ISS began providing aviation wire to Shannon Aircraft Motorworks, later renamed Shannon Ireland and Shannon Canada (together, "Shannon"). Construing the facts in the light most favorable to the non-moving party, ISS was the sole distributor of aviation wire to Shannon from 1990 through 1995. From 1992 to 1995, Shannon ordered wire from ISS 111 times, an average of about one order every nine business days.

To fill orders from Shannon, ISS obtained wire from Austral, a manufacturer of insulated wire. ISS did not have a written distributorship agreement with Austral. ISS used a freight forwarder to prevent Austral from discovering the identity of ISS's clients and selling directly to them. Austral dealt with its customers on a "quote by quote" basis, without any formalized relationships. Under this system, customers called Austral and received a quote for the purchase

price of wire. Between 1989 and 1993, Austral's clients included a major distributor, several smaller distributors such as ISS, and end-users.

In 1993, Austral changed course and entered into exclusive distributorship agreements with distributors in Canada and the United States. As part of its new relationship with its American distributor, Electrical Insulation Suppliers ("EIS"), Austral agreed to end its relationships with other independent distributors in the United States and to instruct its direct customers that orders within the continental United States would have to be placed with EIS. In 1995, Austral stated that it would no longer sell wire to ISS unless ISS disclosed the identity of its customers. ISS initially refused, but agreed when Austral promised not to use the information to sell directly to ISS's clients. After obtaining ISS's client information, Austral contacted Shannon directly. Austral then stopped selling wire to ISS, leaving ISS unable to fill subsequent orders from Shannon. ISS and its sole employee and shareholder, German Bravo, went bankrupt.

On January 14, 1998, ISS sued Austral in Florida state court for tortious interference with an advantageous business relationship. After Austral removed the case to federal district court based on diversity jurisdiction, a jury heard the action from August 10-12, 1999, and returned a verdict for ISS. The district court then entered judgment as a matter of law in favor of Austral under Federal Rule of

Civil Procedure 50(b). The district court held that ISS failed to show an advantageous business relationship, and, alternatively, that the privilege of competition justifies any interference by Austral in the ISS-Shannon relationship. ISS appeals.

## II.

We review the district court's grant of summary judgment de novo. Ross v. Rhodes Furniture, Inc., 146 F.3d 1286, 1289 (11th Cir. 1998). Under Florida law, the elements of tortious interference with a business relationship are: (1) the existence of a business relationship that affords the plaintiff existing or prospective legal rights; (2) the defendant's knowledge of the business relationship; (3) the defendant's intentional and unjustified interference with the relationship; and (4) damage to the plaintiff. Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So.2d 812, 814 (Fla. 1994). A business relationship need not be evidenced by a contract, but it generally requires "an understanding between the parties [that] would have been completed had the defendant not interfered." Id.

A.    Existence of a Business Relationship

The district court held that ISS failed to demonstrate a business relationship with Shannon. The court emphasized that nothing bound Shannon to buy wire from ISS, leaving Shannon free to take its business elsewhere. The court

concluded that it found "no case that holds that a history of discrete sales is not [sic] sufficient to demonstrate an advantageous business relationship."

In examining ISS's tortious interference claim, we are confronted with a seemingly divergent body of Florida law. Our analysis begins with <u>Ethan Allen</u>, where the Florida Supreme Court addressed a dispute between Ethan Allen, a furniture manufacturer, and its former furniture dealer, Georgetown Manor. 647 So.2d at 814. Georgetown decided to convert its Ethan Allen galleries to other furniture outlets. <u>Id.</u> Ethan Allen responded by placing an advertisement in several newspapers that announced its split with Georgetown and asked customers who had unfilled orders with Georgetown to contact the new Ethan Allen outlets. <u>Id.</u> Georgetown then sued Ethan Allen for tortious interference with its alleged business relationship with past Georgetown customers. <u>Id.</u> The Florida Supreme Court rejected Georgetown's claim, holding that Georgetown's relationship with its 89,000 past customers was not one upon which a tortious interference claim could be established because Georgetown's hope that some of its past customers would continue to buy from Georgetown was mere "speculation." <u>Id.</u> at 815. The court concluded that "Georgetown had no identifiable agreement with its past customers that they would return to Georgetown to purchase furniture in the future." <u>Id.</u>

In finding no business relationship between Georgetown and its past

5

customers, the Florida Supreme Court distinguished Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc., 384 So.2d 303 (Fla. 5th DCA 1980). In Insurance Field Services, the Florida District Court of Appeals held that the plaintiff, who had regularly been performing underwriting inspections, premium audits, and loss control work for sixteen insurance company clients, could establish a business relationship with these companies even though the plaintiff and his clients did not have written agreements. Id. at 306. The Ethan Allen court noted that the relationship in Insurance Field Services was "ongoing" and "far different than the one maintained by a retail furniture dealer with 89,000 past customers." 647 So.2d at 815 n.1.

In Ferguson Transportation, Inc. v. North American Van Lines, Inc., 687 So.2d 821 (Fla. 1996), the Florida Supreme Court recently reiterated the distinction made by Ethan Allen between relationships with the community at large and with an identifiable customer. The Ferguson court examined a tortious interference claim brought by Ferguson Transportation against North American Van Lines. Ferguson contracted with North American to be North American's exclusive agent in Broward County. Id. at 821-22. Subsequently, North American appointed Advance Relocation & Storage of Florida, Inc. as its agent in West Palm Beach. Id. at 822. After Advance Relocation intruded into Ferguson's territory in Broward

6

County, Ferguson sued, alleging that North American and Advance Relocation tortiously interfered with Ferguson's relationships with its Broward County customers. Id. The Florida Supreme Court rejected Ferguson's claim, holding that Ferguson's relationship with Broward County's general population did not constitute a business relationship; instead, the court agreed with the lower court's determination that Ferguson was required to show a business relationship with an identifiable person. Id. at 822 (citing North Am. Van Lines, Inc. v. Ferguson Transp., Inc., 639 So.2d 32, 33-34 (Fla. 4th DCA 1994) ("At trial Ferguson was unable to bring forth a single customer who would have patronized Ferguson but for the interference by North American. Ferguson presented no one who booked a move with North American through Advance Relocation who had been a customer of Ferguson or was even a prospective customer of Ferguson.")); see also Sarkis v. Pafford Oil Co., 697 So.2d 524, 526-27 (Fla. 1st DCA 1997) (noting the distinction made by Ethan Allen and Ferguson between relationships with the community at large and with an identifiable customer).

In Dunn v. Air Line Pilots Ass'n, 193 F.3d 1185 (11th Cir. 1999), this Court recently recognized the distinction Florida courts draw between a relationship with the community at large and with an identifiable customer. In Dunn, a group of airline pilots that continued to work during a pilot strike sued a pilots' union that

7

placed the group on a list of "scabs" for tortious interference. Id. at 1189-90. The pilots claimed that the union's "publication of the scab list prohibited them from obtaining employment with any commercial airline-in other words, that it interfered with the pilots' ability to sell their labor to the general community." Id. at 1191. This Court rejected the pilots' claim, holding that a tortious interference claim requires "a relationship with a particular party, and not just a relationship with the general business community." Id. (citing Ethan Allen, 647 So.2d at 815); see also Future Tech Int'l, Inc. v. Tae IL Media, Ltd., 944 F. Supp. 1538, 1570 (S.D. Fla. 1996) (Marcus, D.J.) (examining a tortious interference claim under Florida law and distinguishing between relationships with the community at large and ongoing relationships with existing customers).

In this case, ISS alleges a relationship with an identifiable customer, Shannon, whom ISS continually supplied with aviation wire from 1990 to 1995. Thus, we are not presented with a situation like Ethan Allen, where the plaintiff merely alleged a relationship with the community at large. Instead, this case is more similar to the relationship at issue in Insurance Field Services, where the plaintiff had ongoing relationships with sixteen clients. 384 So.2d at 306; see also Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982) (holding that the plaintiff, who manufactured and sold power cable

benders to electrical wholesale suppliers, "established a business relationship with its sales representatives and various distributors of its product").  Moreover, from 1992 to 1995, Shannon ordered wire from ISS 111 times, an average of about one order every nine business days.  Although the district court correctly noted that Shannon had no obligation to continue to purchase wire from ISS, neither did the insurance companies in Insurance Field Services have an obligation to continue using the plaintiff's services.  384 So.2d at 304-06; see also Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127-28 (Fla. 1985) (affirming the lower court's finding of a business relationship with no apparent obligation to continue the relationship); Magre v. Charles, 729 So.2d 440, 444 (Fla. 5th DCA 1999) (same); see also Restatement (Second) of Torts § 766B cmt. c (1977) ("Also included [as tortious interference with a business relationship] is interference with a continuing business or other customary relationship not amounting to a formal contract.").

Austral correctly notes that ISS did not establish a likelihood that its dealings with Shannon would be formalized in a written agreement.  Austral points to the Ethan Allen court's statement that, generally, a business relationship requires proof that an agreement would "in all probability have been completed if the defendant had not interfered."  647 So.2d at 815.  This statement does provide some suggestion that Florida courts would require ISS to prove that its relationship

9

with Shannon would have resulted in a contract had Austral not interfered. However, Ethan Allen did not overrule Insurance Field Services, where there was no evidence that the plaintiff and his customers would have formalized a written agreement had the defendant not interfered. See 384 So.2d 303. Nor did Ethan Allen overrule or criticize precedent that did not require the plaintiff in a tortious interference case to prove that a contract would have been reached with its business relationship had the defendant not interfered. See, e.g., Tamiami Trail Tours, 463 So.2d at 1127-28 (affirming the lower court's finding of a business relationship despite the apparent absence of a contract or a likelihood of an imminent contract). Indeed, recent case law generally has not interpreted Ethan Allen to require such proof. See, e.g., Magre, 729 So.2d at 444 (finding a business relationship despite the absence of a contract or a likelihood of an imminent contract); see also Restatement (Second) of Torts § 766B cmt. c (1977) (stating that it is unnecessary for a prospective business relationship to "be expected to be reduced to a formal, binding contract"); but see ISS Cleaning Servs. Group, Inc. v. Cosby, 745 So.2d 460, 462 (Fla. 4th DCA 1999) (rejecting a tortious interference claim when the plaintiff "failed to present competent substantial evidence of an actual and identifiable agreement between Controlled Services and himself which in all probability would have been completed had the alleged interference not

10

occurred").

Additionally, Austral points out that Ethan Allen requires proof of a "business relationship that affords the plaintiff **existing or prospective legal or contractual rights**." 647 So.2d at 814 (emphasis added). ISS makes no claim of having either existing or prospective legal rights in its relationship with Shannon. Nevertheless, some courts analyzing Florida tortious interference law have not required the plaintiff to demonstrate the existence of legal rights in the alleged business relationship. See, e.g., Tamiami Trail Tours, 463 So.2d at 1127-28 (affirming lower court's finding of a business relationship despite the apparent lack of any legal rights in the relationship between the plaintiff and third party); Insurance Field Servs., 384 So.2d 303 (same); Magre, 729 So.2d at 444 (same). However, other Florida courts have emphasized plaintiffs' lack of legal rights with their alleged business relationship in rejecting plaintiffs' tortious interference claims. See, e.g., Register v. Pierce, 530 So.2d 990, 993 (Fla. 1st DCA 1988) ("The subject complaint does not allege any facts to demonstrate that the business relationship between Register and the other eleven members of the Association afforded Register any legal rights that have been substantively damaged due to Hvide's alleged conduct; on the contrary, Register alleges that each of the twelve members of the Association is an independent contractor in respect to piloting

11

services for vessels and their owners and masters."); Lake Gateway Motor Inn, Inc. v. Matt's Sunshine Gift Shops, Inc., 361 So.2d 769, 772 (Fla. 4th DCA 1978) ("We do not find any evidence of any legal rights in existence between the two operators. A mere offer to sell a business which the buyer says he will consider, does not by itself give rise to legal rights which bind the buyer or anyone else with whom he deals."); American Bank v. Stiles, 731 S.W.2d 332, 343 (Mo. Ct. App. 1987) (interpreting Lake Gateway to require that the plaintiff have existing legal rights in his alleged business relationship, though rejecting this requirement, stating that "[s]uch a rule is too restrictive given that Missouri cases have recognized instances wherein a valid business expectancy exists with neither buyer nor seller having acquired legal rights binding one or the other"); but see Azar v. Lehigh Corp., 364 So.2d 860, 862 n.2 (Fla. 2d DCA 1978) (distinguishing Lake Gateway by stating that "the business relationship allegedly interfered with [in Lake Gateway] had already deteriorated to the point that it could hardly be considered mutually advantageous").

As a federal court, we are hesitant to insert ourselves in an area of state law that is lacking in clarity. Instead, we think it better simply to assume for purposes of this case that ISS had a "business relationship" with Shannon because, even if such a relationship existed, Austral's actions are justified by the privilege of

competition.

B.    The Competition Privilege

The district court held that, even if ISS established a prima facie case of tortious interference, the privilege of competition justified Austral's interference with the ISS-Shannon relationship.  Florida law recognizes the right of competitors to compete for customers.  Wackenhut Corp. v. Maimone, 389 So.2d 656, 658 (Fla. 4th DCA 1980).

The first issue we confront in determining whether Austral's actions are protected by the privilege of competition is which party bears the burden of persuasion.  The answer is far from clear.  See Restatement (Second) of Torts § 767 cmt. k (1977) (stating that "there is little consensus on who has the burden of raising the issue of whether the interference was improper or not and subsequently proving that issue").  The traditional approach places the burden on the defendant to establish justification or privilege for his conduct.  See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 130 (5th ed. 1984).  However, critics of this approach claim that placing the burden on the defendant to show justification for his actions "requires too little of the plaintiff" because "[t]he major issue in the controversy -- justification for the defendant's conduct -- is left to be resolved on the affirmative defense of privilege."  Leigh Furniture & Carpet Co. v. Isom, 657

13

P.2d 293, 303 (Utah 1982).  Indeed, some commentators suggest that the

Restatement moves away from the traditional rule, instead placing the burden on

the plaintiff to prove that the defendant's interference is improper.  See Prosser and

Keeton on the Law of Torts § 130;  see also Alex B. Long, Tortious Interference

with Business Relations: "The Other White Meat" of Employment Law, 84 Minn.

L. Rev. 863, 870 (2000) (stating that "courts that have adopted the approach of the

Second Restatement typically place on the plaintiff the burden of showing that the

interference was improper or unjustified").

One treatise suggests that a Florida court has adopted the modern

Restatement approach.  See Prosser and Keeton on the Law of Torts § 130 (citing

Lake Gateway as placing the burden on the plaintiff to show the defendant's

interference as improper).  However, in Unistar Corp. v. Child, 415 So.2d 733 (Fla.

3d DCA 1982), a Florida appellate court stated that Lake Gateway

> stand[s] for the rule that a showing of an intentional and unjustified
> interference with an existing business relationship which causes
> damage to the plaintiff establishes a prima facie case, and that the
> burden then shifts to the defendant to justify that interference.  If the
> defendant can prove that the interference was lawful competition . . .
> the defendant will not be found to have committed the tort of
> wrongful business interference.

Id. at 734-35.  Thus, the Unistar court apparently places the burden on the plaintiff

to show "unjustified" interference, but then requires the defendant to prove that the

14

interference was "lawful." Id.; see also Ethan Allen, 647 So.2d at 814 (listing "the defendant's intentional and unjustified interference with the relationship" as part of a tortious interference claim) (emphasis added). However, when courts talk about a party's act as "unjustified" or "unlawful," they essentially are talking about the same thing. See Four Nines Gold, Inc. v. 71 Constr., Inc., 809 P.2d 236, 245 (Wyo. 1991) (Urbigkit, C.J., dissenting) (referring to justification, privilege, and "not improper" as "all being the same concept"). Therefore, it is not immediately apparent what the Unistar court intended by placing the burden on the plaintiff to show "unjustified" interference and then requiring the defendant to show that the interference was "lawful." A clearer exposition on this issue is found in Greenberg v. Mount Sinai Medical Center, 629 So.2d 252 (Fla. 3d DCA 1993), where the court explicitly held that once the plaintiff establishes a prima facie case of interference, the burden shifts to the defendant to justify the propriety of its conduct. Id. at 256. Without deciding the issue, we assume that the burden is on Austral to justify its interference with the ISS-Shannon relationship.

To establish the competition privilege, Austral must show that: (1) the ISS-Shannon relationship concerned a matter involved in the competition between Austral and ISS; (2) it did not employ improper means; (3) it did not intend to create or continue an illegal restraint of competition; and (4) its purpose was at

15

least in part to advance its interest in competing with ISS. Restatement (Second) of Torts § 768(1) (1977). Whether interference with a business relationship is privileged "depends upon a balancing of the importance . . . of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important." Heavener, Ogier Servs., Inc. v. R.W. Florida Region, Inc., 418 So.2d 1074, 1076 (Fla. 5th DCA 1982); see also Morsani v. Major League Baseball, 663 So.2d 653, 657 (Fla. 2d DCA 1995) ("Where there is a qualified privilege to interfere with a business relationship, the privilege carries with it the obligation to employ means that are not improper."); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982) ("Although businesses are accorded leeway in interfering with their competitors' business relationships, they must abide by certain 'rules of combat' and not use improper means of competition."); Johnson Enters. v. FPL Group, Inc., 162 F.3d 1290, 1321 (11th Cir. 1998) ("Florida law recognizes the principle that actions taken to safeguard or protect one's financial interest, so long as improper means are not employed, are privileged."). "[W]hen there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the

16

manner in which they would operate upon the facts in question." Manufacturing

Research, 693 F.2d at 1040 (citation and internal quotations omitted).[1]

In Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092

(11th Cir. 1983), this Court examined a tortious interference counterclaim brought

by Xerographic Supplies Corp. against Royal Typewriter, Inc.  After Royal assured

Xerographic officials that it would not compete with Xerographic in Miami,

Xerographic became a dealer of a type of Royal photocopier.  Id. at 1097.

However, Royal proceeded to send several letters to Xerographic's customers,

"inviting them to do business with Royal on a 'straight purchase' basis and

suggesting that it would be better to do business with Royal directly than with a

local dealer."  Id. at 1098.  After Royal sent these letters, Xerographic lost at least

one customer.  Id.  This Court rejected Xerographic's tortious interference claim,

---

[1]The dissent notes that a Florida intermediate appellate court has stated: "The question of whether an action is privileged is a jury question."  Monco Enters., Inc. v. Ziebart Corp., 673 So.2d 491, 492 (Fla. 1st DCA 1996); see also Greenberg v. Mount Sinai Med. Ctr., 629 So.2d 252, 256 (Fla. 3d DCA 1993); Hospital Corp. of Lake Worth v. Romaguera, 511 So.2d 559, 561 (Fla. 4th DCA 1987).  However, the Florida Supreme Court has not decided whether privilege is an issue for jury consideration and the Florida intermediate appellate courts are split on the issue, with some courts finding privilege as a matter of law.  See Babson Bros. Co. v. Allison, 337 So.2d 848, 850-51 (Fla. 1st DCA 1976); Nitzberg v. Zalesky, 370 So.2d 389, 392 (Fla. 3d DCA 1979), rev'd on other grounds, Ethyl Corp. v. Balter, 386 So.2d 1220 (Fla. 3d DCA 1980); Serafino v. Palm Terrace Apts., Inc., 343 So.2d 851, 853 (Fla. 2d DCA 1976), rev'd on other grounds, Ethyl Corp., 386 So.2d 1220; Ethyl Corp., 386 So.2d at 1224.  Although we share some of Judge Wilson's concerns about granting judgment as a matter of law on privilege issues, since the Florida courts have not resolved this issue, we follow this Court's decision in Royal Typewriter.

holding that although Royal's promise may have established a cause of action for breach of contract or fraud, the competition privilege barred Xerographic from turning Royal's broken promise not to compete into a tortious interference claim. Id. at 1105.

In this case, Austral promised ISS that it would not sell directly to ISS's customers if ISS told Austral the identity of its customers. However, Austral subsequently broke that promise and sold directly to Shannon. The factual similarities between this case and Royal Typewriter compel us to agree with Austral that its actions are justified by the competition privilege.

In arguing that the competition privilege does not protect Austral's actions, ISS directs our attention to case law outside Florida. See Monette v. AM-7-7 Baking Co., 929 F.2d 276, 281-83 (6th Cir. 1991) (holding that the defendant improperly induced the breach of a business relationship when the defendant accompanied the plaintiff on his sales route under the pretext of helping the plaintiff increase his sales, but instead compiled a list of the plaintiff's customers and used the customer list to assume the plaintiff's route); Island Air, Inc. v. LaBar, 566 P.2d 972, 979-80 (Wash. Ct. App. 1977) (rejecting the defendant's competition privilege defense when the defendant elicited secret information about the plaintiff's at-will contract with UPS and broke its promise not to use the

18

information to compete with the plaintiff); see also Restatement (Second) of Torts § 767 cmt. c (1977) ("Fraudulent misrepresentations are also ordinarily a wrongful means of interference and make an interference improper. A representation is fraudulent when, to the knowledge or belief of its utterer, it is false in the sense in which it is intended to be understood by its recipient. . . . One may be subject to liability for intentional interference even when his fraudulent representation is not of such a character as to subject him to liability for the other torts."). Were we writing on a clean slate, perhaps the authority cited by ISS would be compelling. However, under nearly identical circumstances, this Court has held that the defendant's actions are justified by the competition privilege. See Royal Typewriter, 719 F.2d at 1105. Therefore, the district court correctly held that Austral's actions are protected by the privilege of competition.

## III.

We AFFIRM the district court and hold that Austral's actions are justified by the privilege of competition.

WILSON, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's decision to assume that the burden is on Austral to justify its interference with the ISS-Shannon relationship. I also concur with their decision to assume that ISS had a "business relationship" with Shannon; indeed, I would find that there was an existing business relationship under *Ethan Allen*, which indicated that a claim for tortious interference could be maintained for ascertainable relationships. *See Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994); *Insurance Field Servs., Inc. v. White & White Inspection and Audit Serv., Inc.*, 384 So. 2d 303, 306 (Fla. Dist. Ct. App. 1980) (holding plaintiff could establish business relationship even though plaintiff had no written contracts). I would find however, that whether an action is privileged is a jury question under Florida law, and that in this case, the jury had sufficient evidence to find that Austral's actions were not justified.

In Florida, when a plaintiff pleads and proves a prima facie case for tortious interference, the burden is on the defendant to avoid liability by showing his action is privileged or justified. *See Monco Enterprises, Inc. v. Ziebart Corp.*, 673 So. 2d 491, 492 (Fla. Dist. Ct. App. 1996). "The question of whether an action is privileged is a jury question." *Id.*

Florida law generally recognizes the right of a business entity to compete for

customers. *See Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1105 (11th Cir. 1983); *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 658 (Fla. Dist. Ct. App. 1980). However, whether the competitive conduct is justified is determined by the "rules of the game." *Insurance Field Servs., Inc. v. White & White Inspection and Audit Serv., Inc.*, 384 So. 2d 303, 306-07 (Fla. Dist. Ct. App. 1980) ("Not only must defendants' motive and purpose be proper but so also must be the means."). It can be difficult to determine what is proper or improper in business competition; thus, it is the province of the jury to make such determinations. *See Manufacturing Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982) ("when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question.") (quoting Restatement (Second) of Torts § 767 cmt. 1 (1977)).

There was sufficient evidence for the jury to find that Austral's actions were not justified by a competition privilege. The jury heard testimony that Austral's national sales manager, Chris Pavlick, told ISS's sole shareholder and employee, German Bravo, that in order to place future orders with Austral, ISS would have to provide the names of its customers. When Bravo refused to name his customers

21

and expressed his concern that Austral might "go around" him, Pavlick assured him that such conduct would be "abominable" and that Austral would never do it. Austral then contacted Shannon directly and stopped selling wire to ISS. ISS was then unable to fill orders, and eventually went bankrupt.

In overturning the jury's verdict for the plaintiff, the district court and the majority substitute their own views that Austral's actions were justified by a competition privilege for the jury's determination that Austral's actions were not justified. The district court improperly overturned a jury verdict on a question Florida law reserves for the jury. Viewing the facts in the light most favorable to the appellant, there is sufficient evidence for the jury to have found as it did. We should hesitate to allow district courts to throw out jury verdicts when those verdicts are based on determinations left to a jury under state law and are supported by sufficient record evidence. I respectfully dissent.