[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 24-10194

Non-Argument Calendar

_____

In Re: HALLUCINATION MEDIA, LLC,

Debtor.

_____

HALLUCINATION MEDIA, LLC,

Plaintiff-Appellant,

*versus*

THE RITZ YBOR, LLC,
N.C.J. INVESTMENT COMPANY,
JOE CAPITANO, JR.,
AMPHITHEATRE EVENTS, LLC,
JOHN A. SANTARO,

2                    Opinion of the Court                    24-10194

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cv-00564-SDM

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

In 2013, Plaintiff Hallucination Media, LLC ("Hallucination") began contract discussions with Defendant Ritz Ybor ("the Ritz") for Hallucination to promote and produce club nights at the Ritz special events venue. Although the parties contest whether an agreement was ever reached, it is undisputed that Hallucination and the Ritz developed a business relationship whereby Hallucination promoted and produced club nights at the Ritz on Friday nights and some Saturday nights from August 2013 until May 2016, when the Ritz allegedly breached the agreement. Around the time that the relationship between Hallucination and the Ritz ended, Amphitheatre LLC ("Amphitheatre")—a competitor to Hallucination—executed a three-year lease agreement to hold events at the Ritz after a fire destroyed its former venue.

After filing for Chapter 11 bankruptcy, Hallucination brought an adversarial proceeding against the Ritz, its managing

member Joe Capitano, and owner N.C.J. Investment Company ("NCJ"); as well as Amphitheatre and its owner John Santoro. Hallucination sought damages against (1) the Ritz and NCJ for breach of a partnership agreement (Count I) and breach of a right of first refusal (Count II); (2) the Ritz, NCJ, and Capitano for self-help eviction in violation of Florida Statutes § 83.05 (Count III); (3) Capitano, Amphitheatre, and Santoro for tortious interference with contracts and business relationships (Count IV); and (4) the Ritz, NCJ, and Capitano for fraudulent inducement (Count V). The bankruptcy court granted summary judgment in favor of defendants on all claims, which the district court affirmed.

On appeal, Hallucination argues that the bankruptcy court erred by (1) granting summary judgment based on affirmative defenses and arguments it argues were never made by defendants, (2) misapplying the law on statute of frauds and competition privilege, and (3) denying its motions to reconsider.[1] After careful review, we affirm.

## I.    Background

The Ritz, with Capitano as its managing member, operated a special events venue in a building owned by NCJ. In 2013, the Ritz, NCJ, and Capitano (collectively "the Ritz defendants") began discussions with Hallucination and its managing members, Bryan Nichols and Steve McClure, about entering into an agreement for

---

[1] In the interest of clarity, the issues on appeal have been reorganized from the format presented in Hallucination's brief.

Hallucination to promote and produce club nights at the Ritz. While it is undisputed that Hallucination and the Ritz developed a business relationship whereby Hallucination promoted and produced club nights at the Ritz on Friday nights and some Saturday nights between August 2013 and May 2016, the parties dispute the nature of the relationship, and whether an enforceable agreement was ever reached. The parties also dispute whether Amphitheatre—a competitor to Hallucination who executed a lease with the Ritz around the time that the Ritz allegedly breached the agreement with Hallucination—tortiously interfered with the relationship between the Ritz and Hallucination. The evidence pertaining to these disputes will be summarized in turn.

*A. E-mails between the Ritz and Hallucination*

The main evidence of the relationship between the Ritz and Hallucination is a series of e-mails between the parties. In May 2013, Stephanie Petrucelli, an agent for the Ritz, e-mailed Hallucination setting out "some talking points from our last sit down." The e-mail then discussed the Ritz's commitment to capital improvements, proposed a 3-year term consisting of Friday and Saturday nights only, attached a financial pro forma projecting the split of the revenue, and listed topics that the parties needed to discuss further. Later that day, Hallucination responded, in part, that there were a few things relating to specifics of the costs and the format of the club nights that "were very concerning to [Hallucination.]"

Two weeks later, in June 2013, Petrucelli e-mailed Hallucination with "a few edits to some of our discussion so we can take the next step to develop a document. I know there is some language needed from you guys....I highlighted those areas in red. Let me know your thoughts." The edits included a placeholder next to the 3-year term, stating that Hallucination was to provide language regarding options to extend the lease or a right of first refusal, and a comment that Hallucination was to draft language dealing with incidents or nuisance. A few days later, after not hearing from Hallucination, Petrucelli sent a follow-up e-mail stating that she "[j]ust wanted to check in to see where you are on the language that we need from your team to move forward to finalize an agreement."

The next day, Hallucination responded with several changes, and noted that "[w]e would like to set up a meeting with everyone tomorrow, if possible . . . so we are all on the same page." Later that day, Petrucelli responded with responses to the changes. In relevant part, she stated that she understood that Hallucination wanted to be protected beyond the proposed 3-year term of the potential lease, and that "[i]t seems the most prudent way to do this would be for certain first right of refusal regarding club nights etc at the end of the term[.]" Ultimately, the e-mail stated that Capitano, the managing member of the Ritz, "fe[lt] confident that we will get aligned and strike an agreement that is favorable for us all," and that they would set up a call to discuss the comments later that day or the next day. This was the last written communication

between the parties prior to the alleged onset date of the agreement.

It appears that, over a year later, in September 2014, the parties still disagreed on the exclusivity of Hallucination's rights on Saturday nights. Hallucination e-mailed Petrucelli that "[w]e cannot be exclusive for just one night guaranteed and have a non-compete for 3 years. . . . [W]e rely on a minimum of two nights in this industry in order to succeed[.]" Thus, Hallucination proposed the following exclusivity language for Saturday nights: "Hallucination shall be granted the right to operate . . . on Saturday Nights." Petrucelli responded that "[w]e appreciate your creative suggestions for Saturday, however, we are not going [to] get there at this time." The next day, Hallucination responded that "[w]e are clearly in a stalemate with the Saturday issue."

Despite the disagreement over terms, Hallucination and the Ritz were able to conduct business together, with Hallucination holding events at the Ritz between August 2013 and May 2016. But eventually, the disagreements proved insurmountable. On January 22, 2016, Hallucination sent Capitano a strongly worded e-mail suggesting that the relationship was not running smoothly. Hallucination stated that the Ritz had not been honoring various aspects of the "agreement" that they had reached. Hallucination ended the e-mail by stating that "[e]ither you choose to uphold your end of the bargain under the terms which we all agreed upon, or you choose to break the agreement." Capitano e-mailed

Hallucination that "I think it is best for us to set a [meeting] for us to figure [out] a plan to sever[] our relationship."

On May 13, 2016, Capitano e-mailed Hallucination that Hallucination's "tenancy by oral agreement is terminated as of May 13, 2016," that Hallucination had "until noon on May 14th to remove its property," and that Hallucination "d[id] not have a right of first refusal[.]" Additionally, Capitano stated that he "ha[d] no legal obligation" to Hallucination because there was no written lease; rather, Capitano stated that Hallucination "operated and paid weekly and your oral tenancy was week to week."

*B. Amphitheatre and the Ritz reach an agreement*

On April 28, 2016, Amphitheatre entered an initial "Promoter Space Rental Agreement," with the Ritz to hold events at the venue for several dates in May 2016. Thereafter, the parties executed a three-year lease for Amphitheatre to hold events at the Ritz. Discussions between Amphitheatre and Ritz commenced after a fire destroyed Amphitheatre's previous venue in April 2016. Because "[t]here were a number of events already booked to take place at the Amphitheatre, and . . . a number of staff members . . . relied upon [Amphitheatre] for their livelihood," Santoro (the owner of Amphitheatre) immediately "began searching for suitable venues to hold . . . events." Santoro had meetings with Capitano, in hopes of moving Amphitheatre's scheduled events to the Ritz. During conversations with the Ritz, "it was [Santoro's] understanding that Hallucinations Media did not have a lease or other contract, and was operating on a week to week basis," and

that the Ritz "began contemplating termination of [the] relationship" in January 2016.

*C. Procedural History*

In May 2016, Hallucination filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. After litigating the main bankruptcy case for nearly three years, Hallucination initiated the instant adversary proceeding against defendants in March 2019. Hallucination sought damages against the Ritz and NCJ for breach of a partnership agreement (Count I) and breach of a right of first refusal (Count II); the Ritz, NCJ, and Capitano for self-help eviction in violation of Florida Statute § 83.05 (Count III); Capitano, Amphitheatre, and Santoro for tortious interference with contracts and business relationships (Count IV); and the Ritz, NCJ, and Capitano for fraudulent inducement (Count V).

Ritz filed an answer, stating in pertinent part that "[t]he parties exchanged several emails, but never reached an agreement," that "no joint venture or partnership was ever formed," and, as an affirmative defense, that "Debtor had, at best, a license to conduct 'club nights' . . . during limited hours on Friday nights." Amphitheatre and Santoro filed a separate answer, stating in pertinent part that neither "Amphitheater [n]or Santoro had knowledge of any of the alleged contracts and business relationships at any material time," and, as an affirmative defense, that "Defendants were entitled to take the actions alleged to

protect their business interest and such actions are privileged and immune from liability for tortious interference."

The Ritz defendants and Amphitheatre defendants then filed separate motions for summary judgment.

## 1. The Ritz defendants' motions for summary judgment

Following a hearing on the motions for summary judgment conducted before the close of discovery, the bankruptcy court granted in part and denied in part the Ritz defendants' motion. As to Counts One and Two for breach of agreement and right of first refusal, the bankruptcy court denied the motion because "[t]he summary judgment record as it stands . . . does not clearly define the business relationship," and "[w]ithout such clarity, it is difficult to determine whether the statute of frauds would bar Plaintiff's claims." The court, however, granted the motion as to Counts Three, Four, and Five. On Count Three, the court held that the Ritz defendants did not engage in self-help eviction because any alleged agreement, to the extent one existed, could not be characterized as a lease because Hallucination did not have a right of exclusive possession to the venue, and, therefore, the provisions of Fla. Stat. § 83.05 did not apply. On Count Four, the court held that Capitano could not engage in tortious interference with a business relationship because Capitano did not act in his individual capacity. And on Count Five, the court held "the application of Florida's independent tort doctrine" barred Hallucination's fraudulent inducement claim. Hallucination filed a motion for

reconsideration under Federal Rule of Civil Procedure 59 on these counts, which the court denied.

After the discovery period progressed and additional evidence was submitted, the Ritz defendants filed an amended and renewed motion for summary judgment on Counts One and Two, which the court granted. As to Count One, the court held that "the [e-mail] communications between the parties are insufficient to create a material issue of fact regarding the essential terms of a three-year partnership agreement." While those documents showed that the parties were working toward an agreement, "they never got beyond the outline" of such an agreement. Indeed, the e-mails demonstrated that Ritz and Hallucination did not even "establish agreement to the material terms of a promotion agreement." And as to Count Two, the court held that "Hallucination does not point to any writing where Ritz or NCJ actually agreed to [a] right of first refusal."

2. Amphitheatre defendants' motion

The bankruptcy court also granted the Amphitheatre defendants' motion. The court held that Hallucination's claim against the Amphitheatre defendants (Count Four—tortious interference with a business contract) failed because of the defense of "competition privilege," which was properly raised by defendants. Hallucination filed a motion for reconsideration under Rule 59, which was denied.

3.  Appeal

Hallucination appealed these rulings to the district court, which affirmed on all counts.  Hallucination then filed the instant appeal.

## II.    Standard of Review

In a bankruptcy case, we sit "as a second court of review and thus examine[] independently the factual and legal determinations of the bankruptcy court and employ[] the same standards of review as the district court." *In re Brown*, 742 F.3d 1309, 1315 (11th Cir. 2014) (quotations omitted).  "Furthermore, when a district court affirms a bankruptcy court's order, as the district court did here, we review the bankruptcy court's decision.  *Id.*  "We review the bankruptcy court's factual findings for clear error and its legal conclusions de novo." *Id.* (quotations omitted).  And we review "[t]he denial of a motion for reconsideration . . . for abuse of discretion." *Sanderlin v. Seminole Tribe of Fla.*, 243 F.3d 1282, 1285 (11th Cir. 2001).

## III.    Discussion

On appeal, Hallucination argues that the bankruptcy court erred by (1) granting summary judgment based on affirmative defenses and arguments that were allegedly never made by defendants, (2) misapplying the law on the statute of frauds and competition privilege, and (3) denying its motions to reconsider. After careful review, we affirm.

### A.  Unpleaded affirmative defenses

Hallucination argues that the bankruptcy court erred by entering summary judgment in favor of defendants based on the (1) statute of frauds and (2) competition privilege because they were "unpleaded affirmative defenses raised for the first time in their motions for summary judgment."

Federal Rule of Civil Procedure (8)(c) provides that, in general, "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." "However, the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses.  We must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule," which "is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it." *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988).  "When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice." *Id.* Moreover, "when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue." *Id.*

With respect to the statute of frauds, while the Ritz defendants' answer did not specifically use the phrase "statute of frauds," it stated that, while the parties exchanged several e-mails, no formal agreement was ever finalized in a signed writing.

Because the statute of frauds requires certain contractual agreements to be in a writing signed by the party to be charged, the answer put Hallucination on notice that the statute of frauds was at issue. *See* Fla. Stat. § 725.01 ("No action shall be brought . . . upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement . . . shall be in writing and signed by the party to be charged[.]").

For a similar reason, Hallucination's arguments related to the competition privilege on its tortious interference claims fail. With respect to the competition privilege defense, while the Amphitheatre defendants' answer did not use the specific words "competition privilege," it described the competition privilege in slightly different words, listing as an affirmative defense that they were entitled to "protect their business interest and such actions are privileged and immune from liability for tortious interference."[2] *See Hassan*, 842 F.2d at 263 ("We must avoid

---

[2] Hallucination also argues in a conclusory fashion, without argument, that the Ritz defendants failed to plead "Capitano's representative capacity immunity defense" as an affirmative defense to Hallucination's tortious interference claim. "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). But even if we considered this waived argument, it fails. The "representative capacity immunity defense" provides that an agent of a corporation acting within his representative capacity cannot be personally liable for a tortious interference claim. *See Cedar Hills Properties Corp. v. Eastern Federal Corp.*, 575 So.2d 673, 676 (Fla. 1st DCA 1991). Because the allegations in the complaint only describe

hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule," which "is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it."). Because an element of the "competition privilege" is whether the purpose of the alleged interference was to advance the defendant's business interest in competing with the plaintiff, *see International Sales & Service v. Austral Insulated Products, Inc.*, 262 F.3d 1152, 1159 (11th Cir. 2001), Hallucination was on notice that defendants intended to assert such a defense. Thus, Hallucination was not prejudiced by defendants' failure to use the specific words "competition privilege" in its answer.[3]

---

Capitano as operating in his representative capacity, it was clear from the face of the complaint that Capitano was entitled to this defense.

[3] Additionally, Hallucination argues that the bankruptcy court erred by basing its decision on unraised arguments; specifically, (1) Hallucination having a license rather than a lease, (2) the independent tort doctrine, and (3) lack of mutual assent. According to Hallucination, the defendants did not raise these arguments in their motions for summary judgment and it was thus improper for the district court to consider them. But Hallucination's argument is belied by the record. As to Hallucination's argument that the defendants did not move for summary judgment on the basis that Hallucination held a license and not a lease, defendants' motion for summary judgment clearly makes that argument. In relevant part, the motion states that "Hallucination alleges an agreement much different than the right exclusively to possess property and it therefore cannot prevail on its claim that it held a lease subject to the provisions of Chapter 83, Florida Statutes." As to Hallucination's argument that defendants did not move for summary judgment on the independent tort doctrine, both defendants and Hallucination presented argument on the independent tort doctrine at a summary judgment hearing, and the

## B. Merits

On the merits, Hallucination argues that the bankruptcy court misapplied the law on (1) the statute of frauds in finding that no partnership or joint venture with a right of first refusal existed, and (2) the competition privilege.

### 1. Statute of Frauds

Hallucination argues that the bankruptcy court misapplied the law on the statute of frauds because the parties had a three-year partnership with a right of first refusal, which Hallucination argues was evidenced by e-mails sufficient to overcome the statute of frauds.[4]  Hallucination's arguments fail.

Florida's statute of frauds states that:

---

defendants' motion stated that Hallucination's fraudulent inducement claim failed because it was not independent from the breach of contract claim—which is precisely what Florida's independent tort doctrine states.  *See Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1239 (Fla. 3d DCA 2020) ("It is a fundamental, long-standing common law principle that a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract.").  Finally, Hallucination's argument that the defendants did not move for summary judgment on mutual assent or ambiguity fails because defendants' motion asserted that a valid contract was never formed.

[4] Hallucination also argues that the doctrine of part performance forecloses application of the statute of frauds.  But the doctrine of part performance is an equitable doctrine only, and it does not apply to damages actions such as this one.  *Dwight v. Tobin*, 947 F.2d 455, 459 (11th Cir. 1991) (citing *Elsberry v. Sexton*, 54 So. 592 (Fla. 1911)).

> No action shall be brought . . . for any lease . . . for a period longer than 1 year, or upon any agreement that is not to be performed within the space of 1 year from the making thereof . . . unless the agreement or promise upon which such action shall be brought, or some note or memorandum thereof shall be in writing and signed by the party to be charged . . . .

Fla. Stat. § 725.01. "To satisfy the statute, a note or memorandum may take almost any possible form." *Kolski ex rel. Kolski v. Kolski*, 731 So. 2d 169, 171 (Fla. 3d DCA 1999). "All that the statute requires is written evidence from which the whole contract may be made out." *Id.* Under Florida law, "[i]t is well established that a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract, and where it appears that the parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting of the minds." *Greater N.Y. Corp. v. Cenvill Miami Beach Corp.*, 620 So. 2d 1068, 1070 (Fla. 3d DCA 1993).

"Under Florida law, a joint venture is a form of partnership[.]" *Williams v. Obstfeld*, 314 F.3d 1270, 1275 (11th Cir. 2002) "A partnership is created only where 'both parties contribute to the labor or capital of the enterprise, have a mutuality of interest in both profits and losses, and agree to share in the assets and liabilities of the business.'" *Id.* (citing *Dreyfuss v. Dreyfuss*, 701 So. 2d 437, 439 (Fla. 3d DCA 1997)). The necessary elements to create a joint venture are (1) a common purpose; (2) a joint proprietary interest in the subject matter; (3) the right to share profits and duty

to share losses; and (4) joint control or right of control. *Id.* at 1275–76.  A court cannot find that a partnership or joint venture exists if any factor is missing. *Id.* at 1276 & n.7.

As an initial matter, Hallucination acknowledges that the alleged agreement was for longer than one year and so the statute of frauds applies, but Hallucination maintains that the e-mails between the parties satisfied the statute of frauds.  But the e-mails between the parties indicate that, while the parties were working towards an agreement, they had not yet finalized that agreement.

For example, after Petrucelli e-mailed Hallucination setting out "talking points," Hallucination responded that there were a few things that "were very concerning."  Petrucelli responded with some edits, and highlighted areas where Hallucination needed to add language in order to "take the next step to develop a document"—including key terms such as whether there would be a right to extend or a right of first refusal. Hallucination responded with several changes and requested a meeting to get "on the same page."  Petrucelli responded to the changes and suggested that a right of refusal might best protect Hallucination's concerns about the end of the term, but that they would set up a call to discuss further, and that Capitano "fe[lt] confident that we will get aligned and strike an agreement that is favorable for us all."  This was the last written communication between the parties prior to the alleged onset date of the agreement.  Then, over a year later, the e-mails between the parties demonstrated that they still had not

agreed over key terms, including whether Hallucination had exclusive rights on Saturday nights.

Thus, these communications do not demonstrate a finalized agreement of any sort, let alone a three-year partnership with a right of first refusal. *Kolski ex rel. Kolski*, 731 So. 2d at 171; *Cenvill Miami Beach Corp.*, 620 So. 2d at 1070. Regardless, there is no mention of forming a partnership or joint venture in e-mails, let alone confirmation that one was officially being entered. And as to the right of first refusal, while the possibility of including such a term was discussed, there is no e-mail confirming its inclusion. Because these e-mails are insufficient "evidence from which the whole contract may be made out," *Kolski ex rel. Kolski*, 731 So. 2d at 171, the bankruptcy court properly granted summary judgment to the Ritz defendants on statute of frauds grounds.

2. Competition privilege

Hallucination argues that the bankruptcy court misapplied the law on the competition privilege in granting summary judgment to the Amphitheatre defendants on Hallucination's tortious interference claim.

To succeed on its tortious interference claim, Hallucination must prove (1) the existence of a contract or business relationship; (2) knowledge of the contract or relationship by the defendant; (3) "an intentional and unjustified interference with the [contract or] relationship by the defendant"; and (4) damage to the plaintiff as a result. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). The competition privilege, if shown, can negate as

24-10194          Opinion of the Court          19

a matter of law the "unjustified interference" element of a tortious interference claim. *See Austral Insulated Prods., Inc.*, 262 F.3d at 1158–59.

To establish the competition privilege defense—*i.e.*, that any interference was lawful and justified—the Amphitheatre defendants were required to show that: (1) the relationship between Hallucination and Amphitheatre "concerned a matter involved in the competition between [them]"; (2) Amphitheatre "did not employ improper means"; (3) "it did not intend to create or continue an illegal restraint of competition"; and (4) "its purpose was at least in part to advance its interest in competing with [Hallucination]." *Id.* at 1159. The bankruptcy court did not err in holding that the competition privilege applied here. As to the first and fourth elements, Hallucination and Amphitheatre are in a similar business and were competing for use of the venue. As to the second element, there is no evidence that Amphitheatre employed improper means—such as fraud, deceit, pretext, or broken promises—to attain the use of the venue. And as to the third element, there is no evidence or suggestion that Amphitheatre sought to illegally restrain competition. Instead, the record shows that Amphitheatre's venue burned down, and so its pursuit of Ritz was simply because it needed a new venue to stay afloat.[5]

---

[5] Hallucination makes arguments, for the first time in its reply brief, related to the merits (1) of its Count III claim against the Amphitheatre defendants for self-help eviction in violation of Florida Statute § 83.05, and (2) its Count V

## C.  *Motions for reconsideration*

Hallucination argues that the bankruptcy court abused its discretion in denying its motions for reconsideration.

"The only grounds for granting a Rule 59 motion [for reconsideration] are newly-discovered evidence or manifest errors of law or fact.  A Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."  *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (alterations adopted) (internal citation and quotations omitted).  Here, the crux of Hallucination's motions for reconsideration merely quarreled with the outcome and attempted to relitigate the matters decided adversely to them, which is not a proper ground for a motion for reconsideration.  *Id.* Although Hallucination asserted errors of law in the bankruptcy court's decisions, the bankruptcy court explained why Hallucination was incorrect, and why summary judgment remained appropriate.  Given that we agree with the district court's summary judgment decision, as discussed above, the district court did not abuse its discretion in denying the motions for reconsideration.

For all the reasons discussed above, we affirm.

---

claim for fraudulent inducement against the Ritz defendants.  But "[w]e decline to address an argument advanced by an appellant for the first time in a reply brief."  *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008).

24-10194            Opinion of the Court                21

**AFFIRMED.**