698 So.2d 1194 (1997)
Levada LEE, etc., Petitioner,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Respondent.
No. 87071.
Supreme Court of Florida.
June 19, 1997.
Rehearing Denied September 10, 1997.
*1196 Dean R. LeBoeuf, Ronald W. Brooks and Rhonda S. Bennett of Brooks, LeBoeuf and Bennett, P.A., Tallahassee, for Petitioner.
Robert A. Butterworth, Attorney General and Laura Rush, Assistant Attorney General; and Edwin R. Hudson of Henry, Buchanan, Hudson, Suber & Williams, P.A., Tallahassee, for Respondent.
Loren E. Levy of the Levy Law Firm, Tallahassee, for The Academy of Florida Trial Lawyers and The Association for Retarded Citizens of Florida, Amici Curiae.
Ellen M. Saideman, Fort Lauderdale, for Advocacy Center for Persons with Disabilities, Inc., Amicus Curiae.
OVERTON, Justice.
We have for review State Department of Health & Rehabilitative Services v. Lee, 665 So.2d 304 (Fla. 1st DCA 1995), in which the district court reversed a judgment rendered against the Department of Health and Rehabilitative Services (HRS) for the alleged negligent care of a mentally retarded woman who became pregnant while in the custody of HRS. The district court held that the doctrine of sovereign immunity barred recovery in this action, finding that the allegations actually challenged the supervision policies dictated by the legislature's "normalization principle" for mentally retarded persons rather than any specific operational negligence. In so holding, the district court certified the following question to be of great public importance:
WHERE A SEVERELY RETARDED RESIDENT OF AN HRS FACILITY BECOMES PREGNANT WHILE IN HRS' CARE, BUT NEITHER THE SPECIFIC CIRCUMSTANCES OF HER IMPREGNATION NOR ANY SPECIFIC ACT OF HRS' NEGLIGENCE IS ALLEGED OR ESTABLISHED AT TRIAL, CAN HRS BE HELD LIABLE IN TORT FOR ALLEGED NEGLIGENT SUPERVISION OF THE RESIDENT, GIVEN THE "NORMALIZATION PRINCIPLE," SECTION[S] 393.13-.14 FLORIDA STATUTES ("THE BILL OF RIGHTS OF PERSONS WHO ARE DEVELOPMENTALLY DISABLED")?
Id. at 307. We have jurisdiction. Art. V, § 3(b)(4), Fla. Const.
We decline to answer the certified question as worded, finding that it does not articulate fully the legal issues involved in this case. We fully agree with the district court's conclusion *1197 that the trial court's judgment was founded in significant part on asserted negligence involving the function of interpreting and implementing the rules governing the number and assignment of employees to supervise and care for the mentally disabled, which is a discretionary policy-making function for which HRS cannot be held liable because those types of decisions are sovereignly immune. Nevertheless, because the record also reflects that HRS employees may have negligently failed to properly carry out their operational duties and because operational negligence is actionable, we conclude that the entire action is not barred under the doctrine of sovereign immunity. We further conclude that the investigatory report of an HRS employee, which substantially supports the claim of operational negligence, as well as expert testimony involving the victim's post-traumatic stress disorder were improperly introduced and relied on in the trial of this case. As a result, we approve the district court's reversal of the trial court's judgment, but we remand this cause for a new trial.
This case concerns extremely difficult policy issues involving the rights of mentally retarded patients to live their lives as normally as possible as opposed to the need for the implementation of restrictions and supervision by HRS to properly care for those persons. In reaching our decision today, we emphasize that the care of the mentally disabled is a critical function that, to a large degree, involves a significant amount of discretion on the part of the legislature and HRS to balance the rights of the patients versus their need for care.
The specific facts of this case are as follows. In March 1987, D.L., a severely retarded woman, became pregnant while she was a resident of Sunland-Marianna ("Sunland"), an HRS intermediate care facility for the mentally retarded. Subsequently, D.L. gave birth to a normal child. After D.L. became pregnant, Levada Lee, D.L.'s mother and legal guardian, sued HRS for the negligent supervision of D.L. It was stipulated that D.L. was under the supervision of HRS at the time of her impregnation.
Evidence of negligent supervision was presented by the testimony of Gene Peacock, an employee of HRS who was assigned to investigate the circumstances of how D.L. became pregnant. In the course of his investigation, Peacock prepared a written report that contained statements of witnesses as well as his opinions and conclusions regarding this case. During his testimony at trial, Peacock read portions of the report to the jury. Specifically, he noted that the incident was reported to him on July 28, 1987; that he interviewed witnesses as part of the investigation including the victim, other patients, and employees of the facility; that the victim told him that several other patients "played nasty" with her in the bathroom and gym; that one patient admitted, then denied, having sex with D.L.; that another patient was overhead bragging that he "got it" with D.L.; and that an employee told him she witnessed a patient "fingering" D.L., but that no report was ever filed by that employee about the incident. The report also indicated that on March 18, 1987, the patients were left at a dance at the gym from 6:30 to 8:45 p.m. without proper supervision and that, in Peacock's opinion, D.L. lacked the capacity for knowing consent. Based on his investigation, Peacock stated in his report that neglect was indicated.
Other evidence indicated that D.L. was impregnated within four days of March 21, which implied that she became pregnant at the dance. On cross-examination, Peacock testified that he was unfamiliar with chapter 393, Florida Statutes (1985)(the normalization statute, which sets forth a patient's bill of rights), and that he had been unable to identify where the abuse occurred, when it occurred, or who committed the abuse. He further stated that the sexual contact "was more than likely by mutual consent."
The testimony of the bureau chief with the Attorney General's Office in the Division of Victim Services and Criminal Justice Programs was also presented. Over defense objection, she testified that, in her opinion, D.L. was forced to have intercourse against her will by a resident at Sunland and that D.L. suffers from post-traumatic stress disorder as a result of that abuse.
The director of the facility testified concerning the number of employees available to *1198 supervise the patients. He acknowledged that state administrative rules required a ratio of one employee for every two patients for those patients in D.L.'s condition; however, he stated that this dealt with total staff ratio rather than just staff on duty and that the facility has complied with this ratio. He further stated that the federal-state survey team had approved the facility's practice of providing a ratio of one employee for every eight patients per unit during the day and a ratio of one employee for every sixteen patients per unit at night. He also stated that the statutory normalization principle required that the facility residents have as much freedom as possible and that the facility did not have the ability to provide one-on-one supervision. The director acknowledged that an abuse report should have been filed if an employee had in fact witnessed a sexual incident such as one patient "fingering" another.
Other witnesses testified regarding staff supervision policies, available funds for this facility, and D.L.'s behavior before, during, and after her pregnancy. Counsel for the plaintiffs specifically emphasized facts regarding insufficient staffing and the expenditure of funds in his arguments to the jury, stating:
Let's review those figures, sir. "How much money did you have in 1987 to care for patients like [D.L.]?" "Well, we go by fiscal year, you see. For the fiscal year '86 and '87, we had $40,582 per patient. In 1987 and 1988, we had $44,412 per patient, that we spent." "Well, gee what was your overall budget?" In '86 and '87, they had $17,971,000. Even though they spent all this money per patient, they only spent $17,100,000. They had over $800,000 left [over]. So they certainly had enough money to provide[D.L.] with more protection.
What about the next year, maybe they had a budget shortfall, no, you see, they got $20,453 [sic] that year. They only spent $18,786,000 of it. They had approximately $1.5 million left over that year. Why couldn't they have used that to provide the level of supervision that [D.L.] needed, that [D.L.] was entitled to[?]
The jury found in favor of D.L., and, as indicated previously, on appeal, the district court reversed the jury verdict, finding that D.L. was actually challenging the supervision policies dictated by the legislature's "normalization principle" for mentally retarded persons rather than any specific operational negligence.
Under section 768.28, Florida Statutes (1995), discretionary policy-making or planning activities of governmental entities remain immune from tort liability. However, immunity from tort liability is waived for negligent activities that are operational and for which a common law duty of care exists. Department of Health & Rehabilitative Servs. v. B.J.M., 656 So.2d 906 (Fla.1995); Trianon Park Condominium Ass'n v. City of Hialeah, 468 So.2d 912 (Fla.1985); Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla.1979). In this instance, the claimant has asserted that HRS breached its duty of care by failing to use reasonable care in the oversight and supervision of D.L. Essentially, she has attempted to establish this breach of duty in two ways. First, she argues that HRS was negligent in establishing the level of supervision in the facility to which D.L. was assigned, particularly because it implemented a 1:8 and a 1:16 ratio of employee for patient care rather than the 1:2 ratio required by state administrative rules. Second, she asserts that HRS employees were negligent in failing to properly follow rules and carry out their assigned duties. This was reflected, for instance, in Peacock's conclusion that the patients were left at the dance without "proper supervision" and the director's statement that an "unusual incident" report should have been filed if an employee did in fact witness another patient "fingering" D.L.
With regard to the first claim, we hold that the doctrine of sovereign immunity bars recovery. The record clearly establishes that the claimant was arguing against the interpretation and implementation of rules governing the supervision of patients and the normalization policy, which are immune discretionary policy-level functions. As noted by the district court:

*1199 HRS' supervision policies being challenged here are dictated by the Florida Legislature's enactment of the Bill of Rights of Persons Who are Developmentally Disabled, sections 393.13-.14, Florida Statutes. These statutes mandate that care in a residential facility such as Sunland-Marianna shall be in the least restrictive setting, and require adherence to the "normalization principle," which is defined in section 393.063, Florida Statutes:
"Normalization principle" means the principle of letting the client obtain an existence as close to the normal as possible, making available to the client patterns and conditions of everyday life which are as close as possible to the norm and patterns of the mainstream of society.
The Bill of Rights of Persons Who are Developmentally Disabled also generally provides that persons with developmental disabilities shall have all the rights enjoyed by citizens of the State of Florida and the United States, and specifically identifies rights to, inter alia, dignity, privacy, social interaction, and participation in community activities, as well as the right to be free from isolation or unreasonable restraint. § 393.13, Fla.Stat.
In sum, the legislature has mandated that HRS provide "normal" living conditions, to the extent possible, to persons with developmental disabilities within its care. Under this directive, HRS' policy is that residents have social functions on the premises and have contact with friends and visitors. Residents are not confined to the institution at all times. Secure, restrictive, and constant supervision is inconsistent with the normalization policy, and one-on-one supervision of residents at all places and at all times is, practically speaking, unrealistic, if not all but impossible.
Lee, 665 So.2d at 306. The functions at issue here involve the fundamental policy objective of caring for the mentally disabled. The assignment of employees to supervise the patients is essential to the realization of that objective. Moreover, the assignment of employees requires the exercise of evaluation, judgment, and expertise on the part of the directors of the facility, who have the duty to assign the employees. Consequently, we conclude that the function of assigning employees to supervise and care for the mentally disabled is a discretionary, policy-making type decision for which HRS is immune. As we stated in B.J.M.,
Indeed, HRS is one of the primary means by which adult society carries out its implicit obligation to care for those who, by reason of age and unfortunate circumstances, cannot care for themselves and have no one else to care for them. It is also apparent, in our view, that making HRS liable for tort damages for its mistakes in judgment in carrying out this task would considerably impair the exercise of that function. Parents, for instance, are granted almost unlimited discretion in carrying out similar responsibilities. It is the rare case where the State will intervene, and the rarer case still that the State will impose tort liability for parental actions. Similarly, the courts, through tort actions, are ill-suited to second-guess HRS's decisions as to the provision and choice of services each time there is an unsatisfactory outcome.

656 So.2d at 914 (emphasis added.)
Next, we address the claimant's assertion that HRS employees improperly performed their assigned duties. Unlike the first claim, which involves immune, discretionary policy-making functions, we conclude that the allegations at issue in this claim are, in fact, operational in nature. We find that the asserted negligent actions, if true, do not require the exercise of basic policy evaluation, judgment, and expertise on the part of the agency or the directors of the facility. For instance, if employees improperly left patients unattended at the dance or witnessed instances of sexual abuse against D.L. and failed to file the appropriate reports or to take the appropriate remedial steps to prevent this type of activity from occurring in the future, those employees may have acted negligently in carrying out their assigned responsibilities. We find that HRS would not be immune from liability for this type of asserted operational negligence on the part of its employees.
*1200 In this case, a significant portion of the evidence and argument was based on those discretionary policy-making functions for which HRS was immune. Because evidence of this immune function was improperly introduced and argued at trial, we find that a new trial is required in which the evidence and arguments must be limited to those acts for which HRS is not immune.
In remanding this case for a new trial, we also find it necessary to address several other issues regarding the propriety of evidence introduced at trial. Specifically, we conclude that the trial judge erred in admitting certain portions of Peacock's investigative report and in allowing Peacock to testify as to statements that were made to him by the victim and other patients during the course of the investigation.
The claimant contends that Peacock's testimony, as well as his abuse report, constituted admissions of a party opponent and were properly admitted at trial under the admissions exception to the hearsay rule set forth in section 90.803(18)(d), Florida Statutes (1995). Alternatively, she asserts that the report was admissible under the public records and reports exception contained in section 90.803(8).
Section 90.803(18)(d) provides that a statement is admissible as a hearsay exception if the statement is "offered against a party and is ... [a] statement by [the party's] agent or servant concerning a matter which in the scope of the agency or employment thereof, made during the existence of the relationship."
Under section 90.803(18)(d), if the employee makes a statement concerning a matter which is connected with a duty within the scope of the employee's agency or employment, the statement is admissible both against the employee and against the employer. If a truck driver, who lacks specific authority to make any statements concerning the way the truck is operated, is involved in an accident, the driver's statements to a bystander regarding the accident are admissible under section 90.803(18)(d) because driving the truck is within the scope of the driver's employment. However, if the truck driver makes statements about anti-trust violations on the part of the employer, those statements would not be admissible because they would not be connected with the employment responsibilities of the driver.
Charles W. Ehrhardt, Florida Evidence § 803.18d (1996 ed.) (footnote omitted).
We conclude the following testimony and evidence regarding the report may be admissible under this exception. First, the record clearly reflects that Peacock was an employee of HRS during the investigation and that the report was made during the scope of his employment. As a result, we conclude that the conclusions reached by Peacock in his report would be admissible as admissions against his employer's interest. Second, statements made by employees of HRS to Peacock during the course of his investigation may be admissible under this provision if the trial judge finds that those statements were made within the scope of employment as set forth above. See, e.g., Metropolitan Dade County v. Yearby, 580 So.2d 186 (Fla. 3d DCA 1991) (statement by county employee in county's traffic accident report regarding county's knowledge of damaged stop sign was admissible against employer).
On the other hand, we conclude that the hearsay statements of the victim and other patients that Peacock repeated at trial and that are included in his report are not admissible under section 90.803(18)(d). Obviously, statements made by the victim and other patients to Peacock would not be admissible under this exception because those individuals were not employees or agents of HRS.
We also conclude that the report was not admissible under the public record and reports exception to the hearsay rule contained in section 90.803(8). That provision makes the following items admissible as an exception to the hearsay rule:
PUBLIC RECORDS AND REPORTS. Records, reports, statements reduced to writing, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency, or *1201 matters observed pursuant to duty imposed by law as to matters which there was a duty to report, excluding in criminal cases matters observed by a police officer or other law enforcement personnel, unless the sources of information or other circumstances show their lack of trustworthiness. The criminal case exclusion shall not apply to an affidavit otherwise admissible under s. 316.1934(5).
Under this provision, two types of public records and reports are admissible into evidence: (1) records setting forth "the activities of the office or agency"; and (2) records of a public office or agency which set forth "matters observed pursuant to duty imposed by law as to which matters there was a duty to report." Ehrhardt, supra, § 803.8. In adopting this exception, Florida specifically excluded a third type of record that is admissible under the corresponding federal rule: that is, "a record setting forth factual findings resulting from an investigation made pursuant to authority granted by law." Id. Records that rely on information supplied by outside sources or that contain evaluations or statements of opinion by a public official are inadmissible under this provision. Id. "In Florida, rather than offering this type of record, a witness must be called who has personal knowledge of the facts." Id. Peacock's report falls squarely within this inadmissible latter category. Consequently, we conclude that only those portions of the report that are admissible under the admissions against interest exception to the hearsay rule should have been admitted at trial.
Finally, we address the issue of testimony offered by the expert witness regarding D.L.'s post-traumatic stress disorder, which we also find was inadmissible. Subsequent to the trial in this case, this Court issued its opinion in Hadden v. State, 690 So.2d 573 (Fla.1997). In that case, we concluded that, as a matter of law, expert testimony offered as substantive evidence of guilt to prove that an alleged victim of sexual abuse exhibits symptoms consistent with one who has been sexually abused does not yet meet the Frye[1] test for admissibility. Hadden dealt with this matter in the context of the sexual abuse of a child rather than the sexual abuse of a mentally retarded individual. We hold that on retrial any expert testimony in this regard must meet the Frye test before it would be admissible.
Accordingly, we approve the result of the district court's decision which reverses the trial court's judgment but remand with directions that a new trial be conducted as limited by this opinion.
It is so ordered.
KOGAN, C.J., and SHAW, GRIMES, HARDING, WELLS and ANSTEAD, JJ., concur.
NOTES
[1] Frye v. United States, 293 F.1013 (D.C.Cir. 1923).