HAZOURI, J.
Jodi Benjamin, as personal representative of the estate of her mother Marlene Gagnon (hereinafter “the Estate”), appeals a final judgment entered against the Estate and in favor of Tandem Healthcare, Inc. (hereinafter “Tandem”) after a jury trial. The Estate raises three issues on appeal: 1) that the trial court erred in admitting a United States Food and Drug Administration (FDA) advisory concerning prescription medication Mrs. Gagnon was taking; 2) that the trial court erred in excluding the testimony of a kitchen worker who overheard another employee of Tandem, a CNA, rush into the kitchen from the dining room and state that Gag-non was choking on coleslaw and a week later this same employee was at a meeting called by the kitchen manager who stated that Mrs. Gagnon had choked on coleslaw and died; 3) that the trial court erred in excluding statutory survivors other than the personal representative of the Estate from the courtroom prior to their testimony. We affirm on points one and three and reverse as to point two and remand for a new trial.
*1079 The genesis of this appeal is an action for wrongful death alleging negligence and violation of a nursing home resident’s rights under sections 400.022 and 400.023, Florida Statutes (2004). Mrs. Gagnon, an Alzheimer’s patient with a history of a swallowing disorder, was a resident at Tandem’s West Palm Beach nursing home. The complaint alleged that Mrs. Gagnon died as a result of choking on food while eating and that Tandem breached its duty of care to Mrs. Gagnon by failing to properly supervise her while she was eating. The case proceeded to trial, wherein the Estate’s experts opined that Tandem’s actions led Mrs. Gagnon to choke and eventually suffer cardiac arrest. Conversely, Tandem’s defense was based on its theory that Mrs. Gagnon suffered a fatal arrhythmia potentially caused by her prescription medication Seroquel and Abilify. To strengthen this theory, Tandem sought to introduce an FDA advisory and accompanying black box warning concerning these medications.[1] Tandem further claimed that Mrs. Gagnon did not choke and that Tandem had met the reasonable standard of care. The issue of causation was hotly contested with both sides presenting experts and other witnesses to support their respective theories.
During Tandem’s opening statement, it asserted that Mrs. Gagnon did not choke to death but had an arrhythmia that was caused by certain medications that she was taking. Tandem also asserted that there would be no witness testifying that, at the time Mrs. Gagnon was in the dining room on the day of the incident, she choked on any food.
The evidence at trial demonstrated that Mrs. Gagnon had difficulty swallowing foods due to contracting polio at a young age, which left her throat partially paralyzed. Mrs. Gagnon avoided choking by taking small bites, chewing carefully, and turning her head to the left while swallowing. In 1999, Mrs. Gagnon was diagnosed ■with dementia and she was prescribed Se-roquel and Abilify. As her dementia progressed, she needed more assistance with swallowing. Because of her difficulty swallowing, she was placed on a mechanical soft diet.
In 2004, Mrs. Gagnon was admitted to Tandem. Tandem was told of Mrs. Gag-non’s history of swallowing issues. Tandem’s speech therapist recommended Mrs. Gagnon eat in the dining room where she could be supervised and recommended she remain on a soft diet.
On the day of the incident giving rise to the claim, Mrs. Gagnon was brought into the dining room for lunch by a certified nursing assistant. At that point, Tandem’s speech therapist was monitoring Mrs. Gag-non. The speech therapist testified that there were no registered nurses in the dining room at that time. She intended to leave the dining room, but before doing so she asked the nursing assistants who were present to watch Mrs. Gagnon. A short time later, one of the nursing assistants noticed Mrs. Gagnon staring blankly in the dining room, and a code blue was called. Tandem’s nurses performed an oral sweep twice, but did not find any food in Mrs.
*1080 Gagnon’s mouth. The Heimlich Maneuver was also attempted without success. The nurses then began CPR, and, upon arrival, the responding paramedics performed advanced cardiac life support on Mrs. .Gag-non. The EMS report indicated Mrs. Gag-non was in cardiac arrest.
Mrs. Gagnon was then transported to the hospital. Certain testimony indicated there was food found in the back of Mrs. Gagnon’s throat in the emergency room, which was suctioned out. Mrs. Gagnon never regained consciousness and a few days later life support was discontinued.
At trial, the side effects of Mrs. Gag-non’s medications and the FDA advisory were extensively discussed during direct and cross-examination of the parties’ respective experts, even prior to the advisory’s admission into evidence.
Dr. Irving Vinger, the Estate’s first expert witness, discussed that an abnormality in Mrs. Gagnon’s EKG may have been a side effect of certain medications she was taking as well as a potential reason for an arrhythmia to start. However, it was his opinion that Mrs. Gagnon’s death was caused by Tandem’s lack of proper supervision, which led to her choking. On cross-examination, he testified that he would not prescribe Seroquel or Ability because they had not been thoroughly studied and because of the possible side effects, including arrhythmia and sudden death. He went on to mention the FDA advisory concerning those medications. Tandem’s counsel had Dr. Vinger review the advisory and marked the document as an exhibit for identification purposes. The document was not admitted at that time. After objections by the Estate, Dr. Vinger was allowed to testify that the advisory applied to Seroquel and Ability, which Mrs. Gagnon had been taking[2], and discussed his understanding of its contents.
The Estate’s next expert, Dr. Richard Kishner, a neurologist, asserted that he had not observed the incidence of heart attacks or arrhythmias in patients taking Seroquel or any complications from Mrs. Gagnon’s use of Seroquel. Then, the following exchange took place between Dr. Kishner and the Estate’s counsel:
Q. Has Seroquel being (sic) taken off the market by the government?
A. No. Several years ago a Black Box Warning was issued but it was not withdrawn from the market.
Q. Doesn’t a Black Box Warning mean that everybody that’s taking the drug is going to drop dead instantly?
A. No. Black Box Warnings typically mean that there can be an increased risk of death associated with the drug. And basically what it is for the physicians is a heads up to say, look, if you’re going to use this drug think about it, use it appropriately, and cautiously; discuss the possible adverse effects to the patient’s family so they know what to do to really basically prevent against adverse effects.
Q. Again, any clinical documentation of cardiac arrhythmias with regard to this lady in this case?
A. No.
In his medical opinion, Mrs. Gagnon choked, which caused a blockage of air to her lungs and resulted in her death. Furthermore, he opined that there was no evidence that the drug Seroquel caused a cardiac arrhythmia in Mrs. Gagnon causing her death. He did acknowledge on cross-examination that Mrs. Gagnon was also taking Ability, which had been listed *1081 in the advisory due to the same association with a slight increase in death based on cardiac arrhythmia or infection. However, he clarified that it had not been shown that the two drugs would act together and have a greater effect than either one would individually. He testified that if there was a high risk, the drugs would have been withdrawn from the market by the FDA.
During Tandem’s case-in-chief, Tandem argued for admission of the FDA advisory under the hearsay exception for public records and reports. See § 90.803(8), Fla. Stat. (2009). The Estate responded that section 90.706, Florida Statutes (2009)[3], was dispositive and precluded use of the advisory as substantive evidence. It also argued that the advisory was not admissible. The trial court overruled the objections.
The main expert testimony presented by Tandem was that of Dr. Steven Meyerson, an internal medicine and geriatrics physician. He refuted the Estate’s position that Mrs. Gagnon had choked and opined that a review of Mrs. Gagnon’s EKG supported the notion that she suffered a fatal arrhythmia. Dr. Meyerson was of the opinion that Mrs. Gagnon’s medications may have led to the arrhythmia although he could not prove it. When he was shown the FDA advisory, Tandem sought to have him read or summarize the contents to the jury. The trial court did not allow this to occur and did not allow Dr. Meyerson to use the advisory to support his opinion based on the Estate’s objections regarding improper bolstering under section 90.706. Nonetheless, Dr. Meyerson testified from his own knowledge and experience regarding the side effects of Seroquel and Ability, specifically that they were known to increase the risk of sudden death from infections or arrhythmias, and these risks were higher in older people.
We first address whether the trial court erred in admitting, as substantive evidence, a written advisory issued by the FDA, which reported results of clinical trials pertaining to drugs including, but not limited to, Seroquel and Ability. The standard of review for admissibility of evidence is abuse of discretion as limited by the rules of evidence. See Padgett v. State, 73 So.3d 902, 904 (Fla. 4th DCA 2011).
The Estate claims the trial court erred in admitting the advisory pursuant to the public records exception to the hearsay rule. The public records exception provides:
(8) PUBLIC RECORDS AND REPORTS. — Records, reports, statements reduced to writing, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency, or matters observed pursuant to duty imposed by law as to matters which there was a duty to report, excluding in criminal cases matters observed by a police officer or other law enforcement personnel, unless the sources of information or other circumstances show their lack of trustworthiness. The criminal case exclusion shall not apply to an affidavit otherwise admissible under s. 316.1934 or s. 327.354.
*1082 § 90.803(8), Fla. Stat. (2009). Under this exception, “two types of public records and reports are admissible into evidence: (1) records setting forth ‘the activities of the office or agency’; and (2) records of a public office or agency which set forth ‘matters observed pursuant to a duty imposed by law as to which matters there was a duty to report.’ ” Arce v. Wackenhut Corp., 40 So.3d 813, 815-16 (Fla. 3d DCA 2010) (quoting Lee v. Dep’t of Health & Rehabilitative Servs., 698 So.2d 1194, 1201 (Fla.1997)). The exception for “the activities of the office or agency” is generally understood to include factual reports focused on the essential functions of the office or agency. See, e.g., Yisrael v. State, 993 So.2d 952, 959 (Fla.2008) (holding that a Department of Corrections release-date letter drafted for the purpose of litigation is not an “activities-based” public record because such a letter is not a regular activity of the Department). The exception for “ ‘matters-observed’ ... must be based upon a public official’s first-hand observation of an event.” Id. (citations omitted).
A third type of public record is admissible under the corresponding federal rule, i.e. “a record setting forth factual findings resulting from an investigation made pursuant to authority granted by law,” but was rejected by the Florida Supreme Court in Lee. Lee, 698 So.2d at 1201 (citation omitted). Accordingly, “[rjecords that rely on information supplied by outside sources or that contain evaluations or statements of opinion by a public official are inadmissible under this provision.” Id. In Florida, under such circumstances, a witness must be called who has personal knowledge of the facts. Id.
We hold that the FDA advisory was admissible pursuant to the “activities of the office or agency” exception. Under this exception, for example, records showing the receipts and disbursements of a governmental department or official reports of a statistical nature are included. See, e.g., Branch v. State, 76 Fla. 558, 80 So. 482, 485-86 (1918) (records of state auditor admissible to show tax receipts); Am. Motors Corp. v. Ellis, 403 So.2d 459, 468 (Fla. 5th DCA 1981) (a study prepared for the United States Department of Transportation entitled National Crash Severity Study Statistics was held admissible under the public record exception to the hearsay rule), rev. denied, 415 So.2d 1359 (Fla.1982); E. Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 983 n. 79 (5th Cir.1976) (noting that a statement in an annual report of the Department of Commerce to the Joint Committee on Defense Pi-oduction was admissible under the public records exception); Givens v. Lederle, 556 F.2d 1341, 1346 (5th Cir.1977) (determining that the Annual Poliomyelitis Summary prepared by the Center for Disease Control, which included the record of other vaccine-induced polio cases, was admissible as a public record).
The FDA is a federal government agency, which is responsible for enforcing the Food, Drug, and Cosmetic Act (“FDCA”), 21 U.S.C. §§ 301 et seq. See Dobbs v. Wyeth Pharms., 530 F.Supp.2d 1275, 1280 (W.D.Okla.2008) (citing 21 U.S.C. § 393), vacated on other grounds, 606 F.3d 1269 (10th Cir.2010), remanded to 797 F.Supp.2d 1264 (W.D.Okla.2011). The primary goal of the United States Congress in enacting the FDCA was “‘to protect consumers from dangerous products.’ ” See Cartwright v. Pfizer, Inc. 369 F.Supp.2d 876, 882 (E.D.Tex.2005) (quoting United States v. Sullivan, 332 U.S. 689, 696, 68 S.Ct. 331, 92 L.Ed. 297 (1948)). A principal function of the FDA is the regulation and supervision of the prescription drug market, including review of clinical research to ensure drug safety. Dobbs, *1083 530 F.Supp.2d at 1280. This function is not discretionary as the FDA is required by statute to monitor the safety of drugs and obligated to take action if the drug is unsafe. See 21 U.S.C. §§ 393(b)(1) and 393(b)(2)(B). Furthermore, the FDA’s duties shall be undertaken “in consultation with experts in science, medicine, and public health....” 21 U.S.C. § 393(b)(4).
Here, the FDA advisory at issue is an official report providing information of a statistical nature regarding certain medications. It sets forth the activities of the agency pursuant to the FDA’s statutory duty to take appropriate action to ensure drug safety, similar to the documents created by other government agencies and admitted into evidence under the public records exception in Ellis, McDonnell Douglas Corp., and Givens, supra. Accordingly, we conclude that the FDA advisory was admissible as a public record as setting forth the activities of the office or agency.
We now address point three. At the start of the trial, Tandem invoked the rule of sequestration. Over the Estate’s objection, the trial court excluded Mrs. Gagnon’s other four children from the courtroom, only allowing the personal representative to remain. On appeal, the Estate argues that the trial court erred in excluding Mrs. Gagnon’s other children from the courtroom under the sequestration rule. It claims all of Mrs. Gagnon’s children were real parties in interest as statutory survivors in this wrongful death action with a right to attend trial. Tandem responds that under the sequestration rule, only Benjamin, as personal representative of the estate, was a “party” to whom the sequestration rule did not apply. § 90.616(2)(a), Fla. Stat. (2009). Furthermore, Tandem contends that the remaining adult children were allowed to remain in the courtroom following their respective testimony.
The sequestration rule, articulated in section 90.616, Florida Statutes (2009), provides in part:
(1) At the request of a party the court shall order, or upon its own motion the court may order, witnesses excluded from a proceeding so that they cannot hear the testimony of other witnesses except as provided in subsection (2).
(2) A witness may not be excluded if the witness is:
(a) A party who is a natural person.
(b) In a civil case, an officer or employee of a party that is not a natural person. The party’s attorney shall designate the officer or employee who shall be the party’s representative.
(c) A person whose presence is shown by the party’s attorney to be essential to the presentation of the party’s cause.
§ 90.616(l)-(2), Fla. Stat. (2009). The rule of sequestration, when invoked, allows courts to exclude witnesses from the trial, but does not permit the court to exclude parties. § 90.616(1), (2)(a), Fla. Stat. (2009); see also J.R. v. State, 923 So.2d 1269,1276 (Fla. 1st DCA 2006).
Accordingly, the dispositive question is whether Mrs. Gagnon’s other children were parties as contemplated by section 90.616, precluding their exclusion. Recently, the Fifth District addressed this issue, albeit in a different context. In discussing whether an attorney’s fee award against a personal representative could be recovered against funds allocated to a survivor under the Wrongful Death Act, the Fifth District stated:
Under Florida’s Wrongful Death Act, an estate’s personal representative brings all claims on behalf of both the estate and the decedent’s survivors. §§ 768.16-.26, Fla. Stat. (2010). The *1084 personal representative has the exclusive authority to conduct litigation and settle all claims. Thompson v. Hodson, 825 So.2d 941 (Fla. 1st DCA 2002); Pearson v. DeLamerens, 656 So.2d 217 (Fla. 3d DCA 1995). The survivors are not parties to the wrongful death litigation, even when the claims are brought for their benefit.
Kadlecik v. Haim, 79 So.3d 892, 893 (Fla. 5th DCA 2012) (emphasis added). As such, we conclude that the party for the purposes of the sequestration rule was Benjamin, as personal representative of the estate, and the trial court did not abuse its discretion in excluding the other children. Goodman v. W. Coast Brace & Limb, Inc., 580 So.2d 193, 194 (Fla. 2d DCA 1991) (“The exclusion of a witness from the courtroom during a trial is a matter peculiarly within the discretion of the trial court.”).
We now turn to point two concerning the trial court’s exclusion of the testimony of one of Tandem’s employees who was prepared to testify concerning statements made about Mrs. Gagnon choking on coleslaw on the day of the incident. During opening statement and closing argument, Tandem’s counsel argued that no eyewitness had seen Mrs. Gagnon choking. The Estate proffered the testimony of a Tandem kitchen worker, Ian Samsoondar, who heard Tandem employees say that Mrs. Gagnon choked. According to Mr. Samsoondar, a CNA ran into the kitchen like she was scared and yelled that “somebody choked on some food.”[4] Mr. Sam-soondar did not know the name of the CNA who ran into the kitchen, but knew she was a Tandem employee who had just observed something in the dining room before she ran into the kitchen. Mr. Sam-soondar did not know if the CNA had personally witnessed the choking or someone had told her that Mrs. Gagnon choked. Tandem argued that Mr. Samsoondar’s testimony was inadmissible because he could not identify the specific Tandem CNA who made the statement and the Estate had failed to prove the CNA had personal knowledge that Mrs. Gagnon choked.
The Estate also proffered Mr. Samsoon-dar’s testimony that after the incident, Tandem’s kitchen manager called a meeting and told the kitchen staff that Mrs. Gagnon had choked on coleslaw. At the meeting, the kitchen manager also told the kitchen staff to be more careful with the food trays. Samsoondar could not recall if the kitchen manager was in the kitchen when the incident with Mrs. Gagnon occurred, but he knew he did not see Mrs. Gagnon choke because he was not in the dining room when the incident occurred. He also did not know where the manager got his information from about the choking. Tandem claimed there was no evidence that the kitchen manager had any first-hand knowledge of whether Mrs. Gagnon had choked. The Estate asserted that these statements were relevant to rebut Tandem’s claims that Mrs. Gagnon had not choked. The trial court sustained Tandem’s objections and excluded Mr. Sam-soondar’s testimony.
The Estate contends that the statement of the CNA and kitchen manager were admissible as admissions of a party-opponent pursuant to section 90.803(18)(d), Florida Statutes (2009). Additionally, the Estate asserts that the statement made by the CNA is also admissible as an excited utterance pursuant to section 90.803(2). We agree.
*1085 Tandem argues that Samsoondar did not see Mrs. Gagnon choke and, therefore, his testimony consisted exclusively of inadmissible hearsay statements. Tandem also asserts that Samsoondar could not identify the speaker and did not know whether the speaker was an eyewitness. As for Sam-soondar’s testimony regarding the kitchen manager, Tandem submits it is also inadmissible because Samsoondar testified that the kitchen manager did not observe the events in question himself, and he did not know where the kitchen manager had obtained his information. Therefore, the testimony could not be reliably traced to an identifiable source with personal knowledge. Tandem also contends the testimony did not fall within the hearsay exception of admissions of a party opponent.
Section 90.803(18)(d) allows admission of a statement offered against a party if it is “[a] statement by the party’s agent or servant concerning a matter within the scope of the agency or employment thereof, made during the existence of the relationship.” § 90.803(18)(d), Fla. Stat. (2009) (emphasis added). Statements under section 90.803(18)(d) are admissible “even in those instances where the employee’s statement is not based on his personal knowledge.” Scholz v. RDV Sports, Inc., 710 So.2d 618, 628 (Fla. 5th DCA 1998). In addition, “[i]t is not necessary for a party to know the name of the person who allegedly has made a damaging statement against the interests of his employer or principal in order for the statement to be admitted as an admission.” Chaney v. Winn Dixie Stores, Inc., 605 So.2d 527, 529 (Fla. 2d DCA 1992) (citation omitted). “Instead, a party may offer circumstantial evidence that the declarant is an employee or agent.” Id.
The Estate asserts that this court’s opinion in Thee v. Manor Pines Convalescent Center, Inc., 235 So.2d 64 (Fla. 4th DCA 1970), supports admission of this proffered testimony. In Thee, a plaintiff sued a nursing home after she fell on a substance that looked like spilled milk. At trial, plaintiff proffered testimony that after her fall she heard a nurse’s aide tell the head nurse, “Milk got spilled, but we mopped it up.” Id. at 65. The trial court excluded this testimony because it did not feel that the plaintiff had sufficiently established the nurse’s aide’s identity as an employee of the nursing home nor had she shown that mopping floors was in the scope of her duties. On appeal, this Court reversed holding the statement was admissible because the nurse was an employee and her statement constituted an admission of the nursing home. Id. at 65-66; see also Troya v. Miami Beach Health Care Group, Inc., 780 So.2d 228, 229 (Fla. 3d DCA 2001) (statement of unidentified hospital employee that there had been “too much wax” on the floor admissible as a party admission to establish negligence); Chaney v. Winn Dixie Stores, Inc., 605 So.2d 527, 529 (Fla. 2d DCA 1992) (statement of apparent but unidentified store employee that “[she] called that boy a few minutes ago to come here and clean this up” admissible against employer to establish actual or constructive notice of dangerous condition).
Tandem and the trial court rely on Keyes v. Tallahassee Memorial Regional Medical Center, 579 So.2d 201 (Fla. 1st DCA 1991). In Keyes, plaintiff underwent hip surgery. Post-surgery her doctor required her to remain in bed with a chest posey for her safety because she displayed signs of senility and confusion. One night after surgery, plaintiff fell when getting out of bed and broke her hip. She filed a negligence action with the focus at trial being on whether the posey had been properly tied to the bed frame. Nurse Barrett testified that one night another *1086 nurse told her she had found plaintiff on the floor with the posey on and the bed rail still up. The trial court found the statement to be hearsay.
On appeal, plaintiff argued the trial court erred by not allowing Nurse Barrett to testify concerning the statements made to her by an unidentified nurse. The First District held that while statements made by an employee of a party in the course of their employment are normally admissible pursuant to section 90.803(18)(d), “the general rule does not have to be applied in cases where there is an insufficient basis to establish whether the statement is made about matters within the personal knowledge of the declarant, or where the statement does not meet other tests of admissibility.” Id. at 204. Finding that there was no evidence that the nurse speaking to Nurse Barrett actually witnessed anything about which she spoke, the First District concluded the statement involved hearsay within hearsay and absent proof that the underlying statement met a hearsay exception or was based on personal knowledge, it was inadmissible under section 90.805.[5]
The Keyes decision appears to be an anomaly because cases from other districts do not impose a personal knowledge requirement. See Metro. Dade Cnty. v. Yearby, 580 So.2d 186, 189 n. 8 (Fla. 3d DCA 1991) (noting that the established rule in Florida and the clear majority rule throughout the country is that an admission by a party opponent or his agent need not be based on the personal knowledge of the party or his agent); see also Scholz v. RDV Sports, Inc., 710 So.2d 618 (Fla. 5th DCA 1998).
Similarly, the second statement made by the kitchen manager during a meeting following the incident with Mrs. Gagnon that Mrs. Gagnon had choked on coleslaw and died was a statement made by a Tandem employee within the scope of his employment and an admission under section 90.803(18)(d).
In Yearby, Metropolitan Dade County was being sued for injuries sustained by Yearby in an intersection collision that Yearby contended in part was as a result of the negligence of Metropolitan Dade for failing to replace a stop sign controlling the intersection which had at some point in time prior to the accident been knocked down. The claim against Metropolitan Dade was for failure to replace the stop sign that governed the traffic in Yearby’s direction of travel.
At trial, the only evidence tending to establish that Dade County had any knowledge of the downed stop sign prior to the accident, and thus was guilty of negligence in not replacing it, was the testimony of Richard Pichardo. Pichar-do was a public service aide for Dade County whose job it was to investigate traffic accidents and subsequently file reports concerning such investigations .... Although he had no independent knowledge concerning his investigation of this accident, he was allowed, over objection, to testify concerning the contents of the accident report which he filed in this case-including the following statement contained therein: “Note the stop sign was knocked down several days earlier. Traffic maintenance was advised.” Pichardo did not recall where he got this information as he had no independent recollection of his investigation, but he did concede that at the time he prepared the report it was an accurate representation of his findings.
*1087 [[Image here]]
The central contention raised on appeal is that the contents of the accident report filed by Dade County’s employee constituted inadmissible hearsay evidence which did not qualify for admission under any of the exceptions to the hearsay rule.
[[Image here]]
Dade County contends that the statement that the subject stop sign had been down for several days prior to the accident sued upon was not based on the personal knowledge of Pichardo because he had no independent recollection of his accident investigation in this case and did not recall where he got the information upon which this statement was based.
580 So.2d at 187-89.
The Third District Court disagreed and stated:
Although there is some contrary authority, the established rule in Florida, and the clear majority rule throughout the country, is that an admission by a party opponent or his agent need not be based on the personal knowledge of a party or his agent. This is so because when a person or his agent speaks against his own interest, as here, or otherwise makes relevant admissions of substantial importance to himself, it may be assumed that he or his agent has made an adequate investigation so that such statements possess, even if not based on firsthand observation, a substantial indi-cia of reliability.
Id. at 189 (footnotes omitted).
The dissent, as did the trial court, relies on Keyes to exclude these admissions by employees of Tandem. As noted, the Keyes decision is contrary to the weight of authority.
The dissent asserts that the kitchen manager’s statement should be excluded as evidence of subsequent remedial measures taken by Tandem. First, it should be noted that Tandem did not assert section 90.407, Florida Statutes (2009), as a basis for exclusion of this proffered testimony. It also is not clear that the kitchen manager’s statement consists of a subsequent remedial measure. Certainly the admission that Mrs. Gagnon choked on coleslaw is not a subsequent remedial measure. “Being more careful” may fall within the exclusionary basis pursuant to section 90.407, but it is not clear that the kitchen employees were being asked to take remedial measures as opposed to reminding the employees to follow preexisting procedures.
Having concluded that the trial court erred in excluding the testimony of Mr. Samsoondar, we must address whether this error was harmless. This court’s standard for determining harmless error was recently enunciated in Special v. Baux, 79 So.3d 755 (Fla. 4th DCA 2011) (en banc). We must be convinced by the party who benefits from the error “that it is more likely than not that the error[s] did not influence the trier of fact and thereby contribute to the verdict.” Id. at 771. From opening statement through closing, counsel for Tandem told the jury that it was not possible for Mrs. Gagnon to have choked because “someone would have seen or heard her choking, she would have been exhibiting signs of choking, that her choking would have been noticed by the staff and that because there was no witness in the dining room that saw or heard that Mrs. Gagnon was choking, there had to be another explanation for her death.” Additionally, Tandem’s expert reiterated this point by also testifying that because none of the staff in the kitchen or the dining room saw or heard Mrs. Gagnon *1088 choking, her injury must have been caused by a cardiac arrhythmia. By excluding this testimony the Estate was denied the opportunity to establish that there were people in the dining room at the time of the incident who heard or saw Mrs. Gag-non choking which would have contradicted Tandem’s arguments to the contrary. We are unconvinced that Tandem has established that more likely than not this error did not influence the trier of fact and thereby contribute to the verdict. We therefore reverse and remand for a new trial.
STEVENSON, J., concurs.
DAMOORGIAN, J., dissents with opinion.

. Nine months after Mrs. Gagnon died, the FDA issued an advisory stating that the use of Seroquel and Abilify as well as other medications in elderly patients suffering from dementia was associated with a 1.6 to 1.7 fold increase in mortality due to heart related events or infections. This advisory was based on seventeen controlled trials.
A black box warning is a warning that appears on the package insert and label of a medication, and other literature describing the medication. The relevant black box warning in this case was discussed at trial, but was excluded from evidence because the trial court ruled that it was cumulative.

. Mrs. Gagnon had been taking these two medications for two years without any complications or side effects.

. 90.706 Authoritativeness of literature for use in cross-examination.-Statements of facts or opinions on a subject of science, art, or specialized knowledge contained in a published treatise, periodical, book, dissertation, pamphlet, or other writing may be used in cross-examination of an expert witness if the expert witness recognizes the author or the treatise, periodical, book, dissertation, pamphlet, or other writing to be authoritative, or, notwithstanding nonrecognition by the expert witness, if the trial court finds the author or the treatise, periodical, book, dissertation, pamphlet, or other writing to be authoritative and relevant to the subject matter.

. It was established that this occurred on the date of Mrs. Gagnon's incident and was the only incident of this kind on that date.

. Section 90.805, Florida Statutes (2009) provides: "Hearsay within hearsay is not excluded under s. 90.802, provided each part of the combined statements conforms with an exception to the hearsay rule as provided in s. 90.803 or 90.804."